CPC INTERNATIONAL INC., Respondent-Appellant, v McKESSON CORPORATION et al., Appellants-Respondents.

First Department, November 13, 1986

222

### APPEARANCES OF COUNSEL

*Moses Silverman* of counsel *(Arthur Liman, Stuart Robinowitz* and *Abby L. Jennis* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for McKesson Corporation and others, appellants-respondents.

*Lewis B. Kaden* of counsel *(Jayne S. Robinson, Lisa Huestis* and *Karoly Gutman* with him on the brief; *Davis Polk & Wardwell,* attorneys), for Morgan Stanley & Co. Incorporated, appellant-respondent.

*Stephen Rackow Kaye (Claire P. Gutekunst, Mary C. Mone, Catherine McGrath* and *William S. Wells,* with him on the brief; *Proskauer Rose Goetz & Mendelsohn,* attorneys), for respondent-appellant.

### OPINION OF THE COURT

Ross, J.

In these two appeals and cross appeal, we are presented with an issue that apparently has not been decided by an appellate court in this State, to wit: is there a private right of action under Martin Act § 352-c (General Business Law art 23-A). The general objective of the Martin Act "is to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited" *(People v Federated Radio Corp.,* 244 NY 33, 38 [1926]). The Martin Act was amended in 1955 to add the subject section 352-c.

The McKesson Corporation (McKesson) is incorporated in Maryland, has its headquarters in California, is qualified to do business in New York State, and its main office in this State is located in New York County.

In 1976 McKesson was allegedly principally engaged in, *inter alia,* the business of the wholesale distribution of drug and pharmaceutical products, chemicals and spirits. During 1976 McKesson purchased the C. F. Mueller Company (Muel-

ler), a leading pasta manufacturer, from New York University Law School.

Mueller was founded in 1867, incorporated in Delaware, and its headquarters and manufacturing plant were located in Jersey City, New Jersey. Following its purchase, Mueller became a wholly owned subsidiary of McKesson, and the Mueller stock was held by the Corporation of America (Corp-Am), which was another wholly owned subsidiary of McKesson. Corp-Am is a California corporation, and it has its offices and principal place of business in California.

Between the date of Mueller's acquisition in 1976 and 1983, McKesson claims that it operated Mueller's successfully. However, according to McKesson, in 1983, as part of its strategy of redeploying its assets and reducing its activities in the food distribution business, McKesson made a decision to examine the possibility of divesting itself of Mueller. As a result of that decision, McKesson conferred with Morgan Stanley & Co. Incorporated (Morgan Stanley), McKesson's financial advisor, for the purpose of arranging for the sale of Mueller's stock.

Morgan Stanley is a Delaware corporation, is qualified to do business in New York State, and its principal place of business and executive headquarters are located in New York County. The business activities of Morgan Stanley include, *inter alia,* investment banking, underwriting, financial counseling, and providing professional assistance to companies and firms in the marketing and sale of businesses and securities.

Subsequent to McKesson's conference with Morgan Stanley, McKesson decided to solicit bids for Mueller from leading food companies throughout the United States. Thereafter, Morgan Stanley provided assistance to McKesson in carrying out this plan, by, *inter alia:* formulating a solicitation and selling process; preparing an outline of an offering memorandum; gathering facts, data and other information from McKesson and Mueller personnel about Mueller's business and operations; participating in the preparation of the offering memorandum and a confidential addendum to it that contained financial information and projections, which documents were ultimately to be submitted to serious bidders for Mueller; privately advertising the availability of the Mueller stock; contacting selected potential purchasers and supplying them with the offering memorandum and confidential addendum, mentioned *supra;* and soliciting bids for the purchase of the Mueller stock.

Mr. Thomas J. Drohan, now deceased, who was the president and chief executive officer of McKesson in 1983, and Mr. H. Eugene Blattman (Mr. Blattman), who in 1983 was vice-president of McKesson and president of its Foods Group, which included Mueller, were the senior members of McKesson's management, and allegedly directed and participated in McKesson's decision to sell Mueller's stock. Mr. Blattman is a California resident.

Soon after McKesson made the decision to sell Mueller, it advised several senior members of Mueller's management, including Mr. G. Clinton Merrick (Mr. Merrick), who was Mueller's president and a McKesson employee; and, Mr. Steven M. Brounstein (Mr. Brounstein), who was Mueller's marketing vice-president, of that decision. Mr. Merrick is a Connecticut resident, and Mr. Brounstein allegedly is a California resident.

The offering memorandum, dated August 1983, was distributed to bidders and contained information relative to Mueller's financial performance and business potential. As mentioned *supra,* this offering memorandum was accompanied by a confidential addendum, which contained, *inter alia,* projections or predictions of Mueller's sales and profits for the three fiscal years ending March 31, 1984 to 1986, indicating a steadily increasing profit and sales. On the first page of the offering memorandum appeared a disclaimer, which purported to release McKesson and Morgan Stanley from any liability relative to representations or warranties.

Eight serious bidders, who had received copies of the offering memorandum and the confidential addendum, in September 1983, visited Mueller's headquarters in Jersey City for a one-day presentation. During this presentation, Mueller executives allegedly described the business, industry trends, historical performance, and the projections, included in the confidential addendum. Furthermore, allegedly Mueller's management pointed out to these potential bidders that the projections were merely estimates, since they were based upon hypothetical assumptions, which by their nature contained uncertainties and risks, and the projections for the fiscal year ending 1984 could fall short by $2,000,000 to $2,500,000. Among the bidders, who attended this presentation was CPC International, Inc. (CPC).

CPC is a Delaware corporation that has its principal place of business and executive headquarters in New Jersey. In

addition, it maintains offices and facilities in New York State, where it is qualified to do business, and is a major food conglomerate. The April 29, 1985 issue of *Fortune* magazine, at page 286, listed CPC as the 87th largest industrial corporation in the United States.

McKesson contends that Mueller opened its books and records to interested bidders, and alleges that, while some bidders accepted that invitation, CPC did not. During this period of time, CPC received advice from its own investment banker, Dillon Read & Co., concerning the opportunity to acquire the Mueller stock.

In October 1983, CPC submitted the highest bid for Mueller, which was approximately $124 million, and McKesson accepted it. Direct negotiations for a contract of sale followed between executives of McKesson and CPC. Examination of the record indicates that, during those negotiations, CPC's attorneys demanded that the projections of, *inter alia,* forecast sales and profits, be included in the contract of sale, as representations and warranties, but McKesson refused to comply. Finally, while McKesson did not warrant the subject projections themselves, McKesson did warrant, in substance, that the projections were made in good faith, and in the ordinary course of business. In pertinent part, section 2.4 (entitled: Financial Statements), subdivision (e) of the AGREEMENT OF PURCHASE AND SALE OF STOCK (Agreement) reads: "(e) The projections * * * were generated by [Mueller], and reviewed by McKesson management, to support the financial operating plan of [Mueller] for the fiscal years ending March 31, 1984 through 1986 . . . McKesson management are using the Projections relating to the fiscal year ending March 31, 1984 to measure the operating performance of [Mueller] for such fiscal year. The Projections have been prepared using the same general format and accounting principles used in the preparation of the Financial Statements referred to in paragraph (a) above".

Furthermore, McKesson warranted in section 2.5 (entitled: Absence of Specified Changes) of the Agreement that: "Since June 30, 1983, there has not been any change in the condition (financial or otherwise), operations, business or properties of [Mueller], except changes in the ordinary course of business, which changes have not in the aggregate been materially adverse. Since such date [Mueller] has not made any change in any method of accounting or accounting practice".

CPC and McKesson entered into the contract of sale on November 9, 1983 in California, and the transaction was closed on November 30, 1983, also in California, with CPC buying the Mueller stock for $124.3 million.

It is undisputed that, subsequent to CPC's purchase, Mueller's business declined. Therefore, approximately 18 months after it purchased Mueller, CPC commenced an action that alleged breach of express warranties and fraud, arising out of the sale of Mueller, against defendants McKesson, Corp-Am, Mr. Blattman, Mr. Merrick, Mr. Brounstein, and Morgan Stanley, for which CPC seeks to recover compensatory and punitive damages.

The five causes of action in the verified complaint, dated April 4, 1985, of the plaintiff CPC (plaintiff) state, in substance, as follows: the first and second causes of action are asserted only against defendants McKesson and Corp-Am for alleged breaches of express warranties, which were contained in subdivision (e) of section 2.4 and section 2.5 of the Agreement, and the subject express warranties concern projections of Mueller's future operating results and of Mueller's current financial condition; the third cause of action is asserted against all of the defendants for alleged common-law fraud, in that defendants McKesson and Corp-Am engaged in a fraudulent scheme to promote the sale of Mueller stock at an inflated price, by knowingly circulating false profit projections, and defendants Messrs. Blattman, Merrick, Brounstein, and Morgan Stanley aided and abetted this fraudulent scheme of defendants McKesson and Corp-Am; the fourth cause of action is asserted against all of the defendants for alleged violations of the Martin Act, which is found in General Business Law § 352-c, in that defendants committed fraud, deception and concealment in New York State in their promotion of the sale of Mueller stock; and, the fifth cause of action is asserted against all of the defendants for alleged violations of Federal Securities Act of 1933 § 17 (a) (15 USC § 77q [a]), in that the defendants used interstate commerce in fraudulently promoting the sale of Mueller stock.

Following the service of this complaint, all of the defendants made preanswer motions to dismiss some or all of the causes of action.

Defendants McKesson and Corp-Am are the only defendants named in all five causes of action, as mentioned *supra*. These two defendants moved, pursuant to CPLR 3211 (a) (7), to

dismiss the fourth and fifth causes of action, on the ground that neither of those causes of action states a claim against them.

The remaining defendants, Messrs. Blattman, Merrick and Brounstein, and Morgan Stanley, move to dismiss the third, fourth and fifth causes of action, which are the only causes of action asserted against them. While defendant Morgan Stanley moves to dismiss, upon the ground of failure to state a cause of action (CPLR 3211 [a] [7]), the three individual defendants move to dismiss on that ground, as well as on other grounds. Therefore, defendants Messrs. Blattman, Merrick and Brounstein move to dismiss these three causes of action, pursuant to CPLR 3013 and 3016 (b), on the ground that these three causes of action fail to state, in detail, the circumstances constituting the alleged wrong. Furthermore, defendants Messrs. Blattman and Merrick move to dismiss these three causes of action, pursuant to CPLR 3211 (a) (8), on the ground that the court lacks personal jurisdiction over them.

In substance, the defendants argue that the reason for Mueller's decline after its purchase by plaintiff was the alleged mismanagement by plaintiff. Moreover, the defendants cite the fact that plaintiff did not take advantage of the opportunity to examine Mueller's books, before purchase, and contend that it is evidence plaintiff was allegedly not particularly interested in Mueller's operating expenses. The defendants also note that plaintiff was a sophisticated purchaser who had retained its own investment banker to advise it during the negotiations, and, therefore, coupling its own expertise with that of Dillon Read, it strains credulity to believe that plaintiff actually relied upon the profit projections concerning Mueller.

Plaintiff opposed defendants' dismissal motions. In its opposition, the plaintiff supplemented the allegations in its complaint with evidentiary submissions. The Court of Appeals stated in *Rovello v Orofino Realty Co.* (40 NY2d 633, 636 [1976]), "Modern pleading rules are 'designed to focus attention on whether the pleader has a cause of action rather than on whether he has properly stated one' (6 Carmody-Wait 2d, NY Prac, § 38.19; see *Kelly v Bank of Buffalo,* 32 AD2d 875 * * *). In sum, in instances in which a motion to dismiss made under CPLR 3211 (subd [a], par 7) is not converted to a summary judgment motion, affidavits may be received for a limited purpose only, serving normally to remedy defects in

the complaint". In the instant case motions to dismiss have been made, pursuant to CPLR 3211 (a) (7), as mentioned *supra,* and our examination of the record indicates that these motions have not, pursuant to CPLR 3211 (c), been converted by notice to ones for summary judgment. Therefore, "[the] complaint, supplemented by * * * plaintiff's additional submissions * * * must be given their most favorable intendment" *(Arrington v New York Times Co.,* 55 NY2d 433, 442 [1982], *cert denied* 459 US 1146 [1983]), when measuring the sufficiency of causes of action contained in a complaint against a motion to dismiss.

By order, entered January 16, 1986, Trial Term disposed of the defendants' dismissal motions, as follows: it granted the motions of the three individual defendants and defendant Morgan Stanley to dismiss the third cause of action, which asserted common-law fraud; it granted the motions of all of the defendants to dismiss the fifth cause of action, which asserted violations of the Federal Securities Act of 1933; it denied the motions of all of the defendants to dismiss the fourth cause of action, which asserted violations of Martin Act § 352-c; and, it denied the motions of individual defendants Messrs. Blattman and Merrick to dismiss the complaint, upon the ground that the court lacks personal jurisdiction over them.

From this Trial Term order, the parties both appealed and cross-appealed, as follows: defendants McKesson, Corp-Am, and Messrs. Blattman, Merrick and Brounstein appeal from that portion of the order, which denied their motion to dismiss the fourth cause of action; defendant Morgan Stanley separately appeals from that portion of the order which denied its motion to dismiss the fourth cause of action; and, plaintiff cross-appeals from those portions of the order, which granted dismissal of the third cause of action against the three individual defendants and Morgan Stanley, and of the fifth cause of action against all of the defendants.

In substance, Trial Term dismissed the third cause of action against the individual defendants and defendant Morgan Stanley since it found that the allegations in the complaint and the evidentiary submissions of the plaintiff clearly indicate that, when it purchased Mueller, plaintiff relied solely upon the express warranties, as to the genuineness of the projections of Mueller's future, made by defendants McKesson and Corp-Am, which appear in subdivision (e) of section 2.4 and section 2.5 of the Agreement. Furthermore,

Trial Term found that plaintiff had failed to connect the individual defendants and Morgan Stanley to the making of these contractual warranties. After our own examination of the complaint and the evidentiary submissions, we agree with these findings of Trial Term.

Although plaintiff alleged that the individual defendants participated in the preparation of the allegedly false projections, and defendant Morgan Stanley distributed them to the bidders, mentioned *supra,* we find no allegations that these actions of the individual defendants and Morgan Stanley were part of a common scheme to have defendants sellers McKesson and Corp-Am contractually warrant the projections. The individual defendants and defendant Morgan Stanley, like other agents, can be held liable for aiding and abetting their principal in the commission of a fraud, but not when the fraud committed is different from the one they may have believed they were participating in *(see, Mack v Latta,* 178 NY 525 [1904]; *Wechsler v Bowman,* 285 NY 284, 291 [1941]; and *Japcap Establishment v Trust For Cultural Resources,* 115 AD2d 382, 384 [1st Dept 1985]).

It is hornbook law that "[a] statement that a business will yield large profits is promissory and a matter of opinion and is not the basis of an action for fraud" (24 NY Jur, Fraud and Deceit, § 86, at 140-141). We recently stated in *Cristallina v Christie, Manson & Woods Intl.* (117 AD2d 284, 294 [1st Dept 1986]) that the mere expression of an opinion about value is not actionable.

■ Furthermore, Trial Term dismissed the fifth cause of action, which, as mentioned *supra,* alleges violations of Federal Securities Act of 1933 § 17 (a) (15 USC § 77q [a]) against all of the defendants, upon the basis that there is no private right of action under this section. We agree.

Plaintiff concedes, at page 38 of its main memorandum, in support of its cross appeal, that the United States Supreme Court has yet to resolve directly the issue of whether there is a private right of action concerning section 17 (a) of the subject Federal act; and, plaintiff calls our attention to the two most recent cases of that court that commented on that issue. Those cases are: *Teamsters v Daniel* (439 US 551, 557, n 9 [1979]), and *Herman & MacLean v Huddleston* (459 US 375, 378, n 2 [1983]). In *Herman & MacLean v Huddleston (supra),* the Supreme Court stated, in footnote 2, in pertinent part, "We have previously reserved decision on whether § 17 (a)

affords a private remedy * * * and we do so once again". The Federal Courts of Appeal are split over this issue as to whether there is a private right of action *(Yoder v Orthomolecular Nutrition Inst.,* 751 F2d 555, 559, n 3 [2d Cir 1985]).

Recently an appellate court in this State dealt with the issue, and held that there is no private right of action under Federal Securities Act of 1933 § 17 (a). A unanimous Bench of the Appellate Division, Third Judicial Department, specifically held in *Mauersberg v Hutton & Co.* (116 AD2d 417, 421 [1986]):

"We note that the statutory scheme of the Securities Act of 1933 created express civil liability for violations of section 11 (a), which prohibits falsehoods and omissions in registration statements (15 USC § 77k [a]), and section 12 (2), which protects purchasers from misstatements or omissions in written and oral communications (15 USC § 77*l* [2]). Each section sets forth specific procedural requirements which must be met before a purchaser can sue under either section *(see,* 15 USC §§ 77m, 77k [e]). On the other hand, while section 17 (a) prohibits the same conduct as do sections 11 and 12, it is not subject to any procedural requirements.

"We conclude that implying a private cause of action under the Securities Act of 1933 § 17 (a) would be inconsistent with the Act's statutory scheme".

Furthermore, the United States Court of Appeals for the Fifth Circuit in *Landry v All Am. Assur. Co.* (688 F2d 381, 389 [1982]) has concluded that there is no evidence of a legislative intent to, either explicitly or implicitly, create a private right of action under Federal Securities Act of 1933 § 17 (a).

The Court of Appeals ruled in *Burns Jackson Miller Summit & Spitzer v Lindner* (59 NY2d 314, 325 [1983]) that before a private right of action can be read into a statute it is necessary to establish whether the Legislature clearly intended to provide this kind of remedy. In that case, the Court of Appeals set forth the test to be used to determine the answer to that question. Specifically, the Court of Appeals stated (p 325): "Whether a private cause of action was intended will turn in the first instance on whether the plaintiff is 'one of the class for whose especial benefit the statute was enacted' * * * But the inquiry does not, as plaintiffs suggest, end there, for to do so would consider but one of the factors involved in the Legislature's determination. Important also are what indications there are in the statute or its legislative history of an intent to create (or conversely to deny) such a

remedy and, most importantly, the consistency of doing so with the purposes underlying the legislative scheme *(Cort v Ash,* [422 US 66] \* \* \*)".

The United States Supreme Court in *Cort v Ash* (422 US 66 [1975]) significantly held that a court may not imply a private right of action into a statute unless there is clear evidence that it was the legislative intent to create such a right.

Based upon the legal authority discussed *supra,* and applying it to Federal Securities Act of 1933 § 17 (a), we conclude that the United States Congress did not intend to create a private right of action under that section.

■ Before turning to a discussion of Trial Term's denial of the motions to dismiss the fourth cause of action, which pertains to the alleged Martin Act violations, we will deal with Trial Term's finding that personal jurisdiction exists, pursuant to CPLR 302 (a) (1) in this State over nonresident individual defendants Blattman and Merrick. Both defendants Blattman and Merrick move, pursuant to CPLR 3211 (a) (8), to dismiss the complaint against them, upon the ground that "the court has not jurisdiction of the person of the defendant". Based upon our review of the record, we agree with Trial Term that this State has jurisdiction over these defendants.

As mentioned *supra,* defendant Blattman, who is a California resident, was vice-president of defendant McKesson and president of its Foods Group at the time that defendant McKesson and Corp-Am divested themselves of Mueller. Furthermore, as was also mentioned *supra,* defendant Merrick, who is a Connecticut resident, was Mueller's president and an employee of defendant McKesson during the period that defendants McKesson and Corp-Am were negotiating the sale of Mueller.

Examination of the personal affidavits of individual defendants Blattman and Merrick, which were submitted in support of their motion to dismiss on jurisdictional grounds, contain admissions that unequivocally indicate that they "engaged in \* \* \* purposeful activity in this State in connection with the matter in suit" *(Longines-Wittnauer Watch Co. v Barnes & Reinecke,* 15 NY2d 443, 457 [1965], *cert denied sub nom. Estwing Mfg. Co. v Singer,* 382 US 905 [1965]).

It is undisputed by defendants Blattman and Merrick that they attended a June 1983 meeting at defendant Morgan Stanley's New York office to discuss implementation of the decision of defendants McKesson and Corp-Am to sell the Mueller stock.

Defendants Merrick and Blattman averred in their affidavits that they were present in New York City and participated in the meeting with Morgan Stanley to determine the manner in which the Mueller stock would be sold.

Incidentally, at the time Mueller was sold, defendant Merrick admitted in his affidavit "I resided in New York City".

CPLR 302 (entitled: Personal jurisdiction by acts of non-domiciliaries) states, in pertinent part:

"(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent:

"1. transacts any business within the state or contracts anywhere to supply goods or services in the state".

Defendants Blattman and Merrick contend that their contacts with New York in this matter were allegedly so minimal that they do not satisfy the jurisdictional requirements of CPLR 302. We disagree.

The meeting in New York attended by defendants Blattman and Merrick with defendant Morgan Stanley in June 1983 was very significant, in view of the fact, *inter alia,* it was at that meeting that the plans were discussed for the implementation of the McKesson decision to sell the Mueller stock. Shortly thereafter the allegedly false projections about Mueller were prepared with the help of defendants Blattman and Merrick. In fact, as quoted *supra,*from defendant Merrick's affidavit, Merrick stated: "After June 28, I paid two more visits to Morgan Stanley's offices to review and comment upon the draft Offering Memorandum the firm had prepared for Mueller * * * As Mueller's President, I received and approved these projections". Subsequently, defendant Morgan Stanley distributed the offering memorandum together with the confidential addendum, which contained these projections, to the bidders, including plaintiff.

New York jurisdiction, pursuant to CPLR 302 (a) (1), may be established over a nondomiciliary, upon the basis "of a solitary business meeting conducted for a single day in New York" *(Presidential Realty Corp. v Michael Sq. W.,* 44 NY2d 672, 673 [1978]). It is not the length of time a nondomiciliary spends in a State that determines whether jurisdiction attaches, but rather: "the quality and nature of the defendant's activity [and] it is essential in each case that there be some

act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum State" *(Hanson v Denckla,* 357 US 235, 253 [1958]).

Upon the basis of the evidence in the record before us, which includes the affidavits supplied by defendants Blattman and Merrick, and those affidavits, as mentioned *supra,* indicate the kind of activity carried on by them in New York, we find that "there is ample basis for concluding [these defendants are] subject to the jurisdiction of our courts * * * [since they conducted] purposeful activity in New York" *(Parke-Bernet Galleries v Franklyn,* 26 NY2d 13, 17-19 [1970]).

■ Trial Term denied the motions of all of the defendants to dismiss the fourth cause of action, which asserted violations of Martin Act § 352-c, upon the basis that there is a private right action under that section. We disagree.

As mentioned *supra,* it appears that no appellate court in this State has directly decided the question: Is there an implied right of private action under Martin Act § 352-c?

In 1921 General Business Law article 23-A (Martin Act) was enacted into law. Its purpose was to protect the public by curbing abuses in the offer and sale of securities and commodities in and from New York. In substance, up until 1955, the Martin Act only authorized the State Attorney-General, in his enforcement of the act, to seek an injunction to stop an alleged fraudulent practice.

The Attorney-General, in 1955, recommended to the Governor and the Legislature, that the Martin Act be amended to add several sections, including section 352-c, in order that he could more effectively enforce it. In his memorandum, the Attorney-General wrote, in pertinent part:

"[T]he commission of fraud as defined in the Martin Act is not made a crime under that Act. While the crimes of larceny, embezzlement, forgery and other felonies would be involved in many security frauds, they require that the prosecutor prove criminal intent, thereby making conviction extremely difficult.

"To avoid these difficulties I am submitting to the Legislature certain amendments to the Martin Act as follows: (1) To provide for criminal punishment * * * (2) To bring within the condemnation of the statute any false promise which tends to deceive and to expressly include within its meaning promises as to the future which are beyond reasonable expectation or unwarranted by existing circumstances; (3) To make clearly

subject to the statute agents and employees of securities distributors subject to it * * *

"It is my opinion that the enactment of such amendments into law will provide sorely needed means of protecting the public interest in the distribution of securities in our State" (mem by Attorney-General, 1955 NY Legis Ann, at 135 [1955]).

Thereafter, both the Legislature and the Governor adopted the Attorney-General's recommendation and amended the Martin Act, to add General Business Law § 352-c.

Trial Term relied on the case of *Barnes v Peat, Marwick, Mitchell & Co.* (69 Misc 2d 1068 [Sup Ct, Special Term, NY County 1972], *mod* 42 AD2d 15 [1st Dept 1973]) in holding that there is a private right of action concerning the enforcement of Martin Act § 352-c.

Special Term, in the *Barnes v Peat, Marwick, Mitchell & Co.* case, was faced with a motion by defendants to dismiss a complaint, upon the ground that it failed to state a cause of action. The complaint, in substance, contended that the defendants had violated Federal Securities Act of 1933 § 17 (a) and Martin Act § 352-c in their sale of stock in a corporation to the plaintiffs. In denying the defendants' motion, insofar as it sought to dismiss the cause of action of the complaint that claimed a violation of Martin Act § 352-c, Special Term, relying on a Federal District Court decision, and several trial court decisions in this State, held (69 Misc 2d, at p 1072) "the better rule * * * is to permit a private claim for relief under" section 352-c. On appeal, this court, without discussing the issue of a private right of action under section 352-c, modified Special Term's order, pending disposition by the Federal courts of class actions concerning the same matter.

The case of *Barnes v Peat, Marwick, Mitchell & Co. (supra)* was decided before *Burns Jackson Miller Summit & Spitzer v Lindner* (59 NY2d 314, *supra)* and *Cort v Ash* (422 US 66, *supra)* which cases, as mentioned *supra,* deal with the interpretation of legislative intent.

We discussed *supra,* the Court of Appeals decision in *Burns Jackson Miller Summit & Spitzer v Lindner (supra)* and the United States Supreme Court decision in *Cort v Ash (supra)* when we decided that there was no private right of action under Federal Securities Act § 17 (a).

Both *Burns Jackson Miller Summit & Spitzer v Lindner (supra)* and *Cort v Ash (supra)* as mentioned *supra,* deal with the test to be applied to determine whether the Legislature

intended to create the remedy of a private cause of action in a statute, when the statute itself is silent.

Applying the aforementioned test, which was discussed in depth earlier in this opinion, we find that there is no private right of action to enforce the provisions of section 352-c.

Our examination of the 1955 Attorney-General's memorandum, set forth *supra,* unequivocally indicates that it was solely the Attorney-General's intent to recommend the enactment of section 352-c for the purpose of enlarging the Attorney-General's enforcement powers, and not to give the public a private right of action to enforce that act. Furthermore, our research indicates that neither the Legislature nor the Governor contemplated the giving of a private right of action to the public. We find conclusively that it was consistent with the purposes underlying the legislative scheme of this act not to give the public a private right of action *(Burns Jackson Miller Summit & Spitzer v Lindner, supra).*

With all due deference to the Federal District and Federal appellate courts that have considered this issue, and implied that a private right of action exists under section 352-c, we declare that we are not bound by those determinations, and reject them *(see, Flanagan v Prudential-Bache Sec.,* 67 NY2d 500, 506 [1986]). It is our conclusion that to imply a private cause of action under Martin Act § 352-c is inconsistent with the Legislature's statutory scheme.

Accordingly, the order of the Supreme Court, New York County (Richard W. Wallach, J.), entered January 16, 1986, which, *inter alia,* (1) granted the motions of defendants H. Eugene Blattman (Blattman), G. Clinton Merrick (Merrick), Steven M. Brounstein (Brounstein) and Morgan Stanley & Co. Incorporated (Morgan Stanley) to dismiss the third and fifth causes of action; (2) granted the motions of defendants McKesson Corporation (McKesson) and the Corporation of America (Corp-Am) to dismiss the fifth cause of action; and it denied the motions of defendants Blattman, Merrick, Brounstein, Morgan Stanley, McKesson and Corp-Am to dismiss the fourth cause of action, is unanimously modified, on the law and on the facts, to the extent of granting defendants' motions to dismiss the fourth cause of action, and except as thus modified, otherwise affirmed, without costs.

MURPHY, P. J., KUPFERMAN and LYNCH, JJ., concur.

Order, Supreme Court, New York County, entered on January 16, 1986, unanimously modified, on the law and on the

facts, to the extent of granting defendants' motions to dismiss the fourth cause of action, and except as thus modified, otherwise affirmed, without costs and without disbursements.