[607 NYS2d 227]

**DH Cattle Holdings Company, Appellant-Respondent, v Leonard Smith, Respondent-Appellant.**

First Department, January 13, 1994

APPEARANCES OF COUNSEL

*Robert N. Chan* of counsel *(Robert M. Kaplan* with him on the brief; *Ferber Greilsheimer Chan & Essner,* attorneys), for appellant-respondent.

*David E. Lipsky* of counsel *(Tab K. Rosenfeld,* attorney), for respondent-appellant.

**OPINION OF THE COURT**

ASCH, J.

Defendant is a professional football player. He hired BP&M Sports, Inc. (BP&M) in 1983, to act as his agent in connection with contract negotiations and the management of his financial affairs. At that time he was a 22-year-old college senior who had been selected in the first round of the National Football League (NFL) draft.

BP&M arranged for defendant to invest in a number of tax shelters. On or about December 1, 1983, BP&M, after assuring defendant that it was a "safe investment", had defendant execute a $490,500 promissory note payable to California Dreamstreet (CD), a California cattle breeding joint venture, along with a related security agreement. Other than being advised of the general nature of the enterprise, at that time, defendant was not provided with any detailed information or documentation.

The note required payment of stated amounts of principal and interest on dates from 1984 through September 1, 1988. Subsequent payments of principal and interest were to be made as animals or semen were sold from defendant's herd of dairy cattle, but in no event later than December 31, 1989. All principal and interest remaining unpaid at the end of the note's term were unconditionally due and payable by the defendant as of that date. The maker was entitled to a grace period of 30 days with respect to each of the above payments.

Defendant contends that he was concerned that Messrs. Black and Paliafito (principals of BP&M) appeared unwilling to provide him with copies of the note and security agreement and "repeatedly sidestepped" his requests for information about the CD venture.

However, after finally receiving several of the venture documents, defendant claims to have become alarmed at seeing the name "Michael Trope" crossed out in several places and replaced with references to CD or BP&M. Defendant had been warned by his friends about Trope, and understood that this individual had been banned from representing NFL players because of his allegedly ruinous financial deals. After defendant confronted his agents, and they continued to be evasive, though denying Trope's involvement, he replaced them and stopped making payments on the note. Defendant concedes that he paid only $40,336.20, with the last payment on January 29, 1985, missing all payments starting with the September 1, 1985 installment.

Thereafter, upon an IRS audit of defendant's tax returns, his investment in CD was found to be a sham transaction and an illegal tax shelter. Moreover, defendant's manner of entering the transaction was found to be not prudent. He had no prospectus, offering plan, or information regarding the note, and, at the time of the IRS audit, could not produce the note or even a copy thereof. The appraisal of the cattle had been received by defendant almost a year after he had entered into the deal, and even then placed a value on the cattle in only a general way. As a consequence, defendant's entire 1983-1986 tax credit arising from the CD venture was disallowed.

After defendant's suspicions about Mr. Trope were allegedly substantiated, in April 1986, defendant entered into a settlement with him as to the BP&M investments by which defendant assigned Trope his rights in CD and Trope assumed defendant's liability on the note. Defendant asserts that the settlement agreement is confidential.

Meanwhile, on July 18, 1985, Cooperative Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank), a Dutch bank, loaned $10 million to a CD affiliate, West Brook Holsteins, Inc. (WB), pursuant to a revolving credit agreement. The principal collateral for the loan was promissory notes pledged to Rabobank by WB and CD pursuant to separate pledge agreements.

In connection with Rabobank's increasing the loan to WB by $5 million and taking additional collateral, on August 26, 1986 they amended their revolving credit agreement. WB and CD pledged additional promissory notes, including the note in issue herein, to Rabobank, and Rabobank took possession of the notes (which had been indorsed in blank).

The Rabobank officer who supervised the loan (Roger L.

Barr) averred that at the time of this transaction Rabobank "took the Note in good faith and without any notice that it was overdue or dishonored or of any defense against it or claim to it on the part of any person" and that, indeed, both CD and WB specifically assured Rabobank to that effect and did so in their pledge agreements as well.

In addition, the corporate president of both CD and WB executed separate certificates accompanying the August 26, 1986 amendment stating that the representations and warranties in the original pledge agreements and the amendment remained accurate and no event of default had occurred as of that date.

Despite the foregoing warranties, defendant asserted in the IAS Court that on the basis of correspondence in Rabobank's files, Rabobank "may have known" about the IRS audit and defendant's claimed defenses to the note. In support of his position, defendant cited the presence of (1) an October 18, 1985 letter from CD to defendant demanding payment and threatening default proceedings; (2) an October 25, 1985 letter from CD to its corporate affiliate, Dreamstreet Holsteins, Inc., stating that its author "know[s] of no reason for [defendant's] refusal to pay"; (3) an October 25, 1985 telegram to CD from defendant's attorneys stating that "we have advised Mr. Smith that he has substantial grounds upon which to terminate his relationship with California Dream Street and to obtain a refund of all moneys invested therein * * * any action taken by you as threatened in your October 18, 1985 letter will leave us with no recourse but to pursue legal remedies in law on behalf of Mr. Smith"; and (4) a June 9, 1986 letter to CD from another law firm representing defendant asking for the documents relating to the cattle venture in order to provide them to the IRS with respect to defendant's tax audit.

However, Mr. Barr, the Rabobank officer who supervised the loan denied that this correspondence had been reviewed by or furnished to Rabobank prior to its taking possession of the note executed by defendant. Defendant has not submitted any evidence to the contrary.

On August 19, 1988, Rabobank notified Dreamstreet Holsteins, Inc. of a default and that the bank intended to enforce collection of the collateral set forth in the pledge agreements and amendments. By agreement dated September 30, 1988, Rabobank assigned all of its rights in the CD loan documents to plaintiff, its wholly owned subsidiary.

Plaintiff commenced the instant action in November 1991, seeking to obtain $727,422.86, representing principal of $450,163.80 and interest of $277,259.06 (at the annual default rate of 10%) in payment of the note, plus attorneys' fees. The answer asserted that plaintiff was not a holder in due course because Rabobank, plaintiff's transferor, had taken the note with notice that it was overdue and with notice of "certain defenses thereunder", and had not taken the instrument in good faith. The Statute of Limitations, illegality, fraud and discharge were claimed defenses.

Defendant moved for summary judgment on the Statute of Limitations defense. Plaintiff, *inter alia,* cross-moved for summary judgment on the grounds that Rabobank was a holder in due course of a negotiable instrument and plaintiff stood in its shoes by virtue of the "shelter" provision of UCC 3-201 (1).

Defendant's motion for summary judgment was denied by the IAS Court. Though a notice of cross appeal was filed by defendant, defendant's brief does not discuss the Statute of Limitations issue or any issues other than those relating to plaintiff's appeal. The cross appeal from the IAS denial of dismissal on limitations grounds is therefore deemed abandoned.

With respect to plaintiff's cross motion, the IAS Court held that the promissory note herein was not a negotiable instrument because payment was not for "a sum certain". It found the provision that "subsequent payments of principle *[sic]* and interest shall be made as animals or semen are sold * * * but in no event later than December 31, 1989" "substantially indistinguishable" from the provision in *DH Cattle Holdings Co. v Reinoso* (176 AD2d 1057 [3d Dept 1991]) that rendered the note in that case nonnegotiable. In *Reinoso (supra,* at 1057), interest was " '[t]o be determined' ", which the Third Department held was not a " 'sum certain' " since the computation could be made only by reference to an outside source.

The nisi prius court also opined that, although the defendant's fraud claim in this action differed from that presented in *Reinoso (supra),* which involved an assertion that the investment was with limited recourse, there was "the possibility" that a similar feature existed in relation to this plaintiff's investment, which might be revealed upon further document production in the instant action.

Based upon the findings in the unpublished decision in *DH Cattle Holdings Co. v Reno* (Sup Ct, Delaware County, Nov. 9,

1992, Mugglin, J., *revd* 196 AD2d 670), which defendant submitted and discussed at length, the IAS Court found that Rabobank had conducted a "single massive investigation" prior to acquiring its interest in the series of tax shelter notes. Justice Mugglin in *Reno* had determined that, as a result of that investigation, plaintiff *in that action* was on notice of certain nonmonetary repayment options as to the notes it held and was therefore not a holder in due course. (The Appellate Division, Third Department, later reversed, finding defendants failed to establish a valid defense.) However, based on the Supreme Court's finding, the IAS Court herein observed that there may be *"the possibility"* that a memorandum containing the nonmonetary repayment option exists in the instant action, which could be revealed after more discovery and held that plaintiff was not a holder in due course.

As noted in *First Intl. Bank v Blankstein & Son* (59 NY2d 436, 444), it is important to remember the respective burdens of proof imposed on each of the parties. UCC 3-307 (2) provides that when a holder produces a properly signed instrument, it is entitled to recover on it unless the defendant establishes a genuine defense. When such a genuine defense is established, the burden then shifts to the holder to establish its status as holder in due course (UCC 3-307 [3]).

In the Third Department decision in *DH Cattle Holdings Co. v Reno* (196 AD2d 670, *supra* [reversing the denial of partial summary judgment to plaintiff and grant of defendants' cross motion for partial summary judgment by the Delaware County Supreme Court]), the majority recited the above rule but inexplicably noted that, "Inasmuch as defendants have failed to establish a genuine defense to the notes, we must therefore conclude that plaintiff * * * is entitled to assert the rights of a holder in due course" *(DH Cattle Holdings Co. v Reno, supra,* at 673, citing *First Intl. Bank v Blankstein & Son, supra,* at 444). In concurring, Justice Casey correctly pointed out that it would not be necessary to determine whether a plaintiff is a holder in due course, rather than merely a holder, unless there is a valid defense to the note *(DH Cattle Holdings Co. v Reno,* 196 AD2d 670, 673, *supra).*

The parties and the IAS Court fall into the same "trap" in devoting most of their analysis to whether Rabobank was a holder in due course. However, based upon the approach set forth in *Blankstein (supra),* we must *first* assess whether Rabobank is a holder of a properly signed instrument, *then* determine whether any proffered defenses to the note are

viable, and *only then,* if there are viable defenses, determine whether Rabobank meets its burden of establishing its status as a holder in due course.

## I HOLDER

There is no dispute as to plaintiff's status as a "holder", which merely requires the possession of an instrument "drawn, issued or indorsed to him or to his order or to bearer or in blank" (UCC 1-201 [20]; *see, Hartford Acc. & Indem. Co. v American Express Co.,* 74 NY2d 153, 159).

## II DEFENSES

There was little legal discussion by the parties or the IAS Court of the defenses to the note. The defense of illegality may be disposed of quickly. The underlying note transaction was not illegal; the only illegality that arose was in defendant's use of the tax credits. That a motive for a transaction results in an ineffective tax scheme does not vitiate the transaction itself. In addition, the letter, dated June 9, 1986, from a law firm representing defendant requesting information for the tax audit does not bear even a suggestion that the note transaction itself was illegal. Moreover, the results of the audit were not provided to defendant until 1988, three years *after* Rabobank accepted the assignment.

The question of fraud is another matter. It should be noted at the outset that there was no misrepresentation shown by defendant. The documents provided to defendant were received after he made the investment, and thus the required element of reliance is absent. The only misrepresentation alleged is the statement by defendant's former agents that it was a "safe investment". However, such statements are generally considered, not actionable statements of fact, but mere opinion and puffery *(see, CPC Intl. v McKesson Corp.,* 120 AD2d 221, 230, *mod on other grounds* 70 NY2d 268).

Nonetheless, a viable defense for fraudulent concealment *may* have been asserted. Mere silence may not amount to a concealment actionable as fraud unless done within the context of a fiduciary or confidential relationship *(see, East 15360 Corp. v Provident Loan Socy.,* 177 AD2d 280, 281).

Here, however, it was defendant's former agents who allegedly failed to disclose the involvement of the allegedly disreputable Trope in the investment scheme, which defendant

only discovered upon seeing Trope's name crossed out in the documents he belatedly received.

### III HOLDER IN DUE COURSE

As previously mentioned, when defendant fails to *demonstrate* the existence of a viable defense to the note, the burden does not shift to plaintiff to show that its transferor was a holder in due course. Even had a viable defense been demonstrated on behalf of defendant, it still would be of no avail since plaintiff met its burden of showing that its transferor was a holder in due course.

A holder in due course

"takes the instrument free from

"(1) all claims to it on the part of any person; and

"(2) all defenses of any party to the instrument with whom the holder has not dealt except

"(a) infancy, to the extent that it is a defense to a simple contract; and

"(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

"(c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

"(d) discharge in insolvency proceedings; and

"(e) any other discharge of which the holder has notice when he takes the instrument." (UCC 3-305.)

UCC 3-302 (1) defines a holder in due course as a (1) holder (2) of a negotiable instrument (3) who took it for value, (4) in good faith, and (5) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of another. Here, the second, forth and fifth elements are in dispute.

### (a) Negotiability

UCC 3-104 (1) sets forth the requisite form for a negotiable instrument, which must, *inter alia,*

"(b) contain an unconditional promise or order to pay a *sum certain* in money and no other promise, order, obligation or

power given by the maker or drawer except as authorized by this Article; and

"(c) be payable on demand or *at a definite time.*" (Emphasis supplied.)

Pursuant to UCC 3-109:

"(1) An instrument is payable at a definite time if by its terms it is payable

"(a) on or before a stated date or at a fixed period after a stated date; or

"(b) at a fixed period after sight; or

"(c) at a definite time subject to any acceleration; or

"(d) at a definite time subject to extension at the option of the holder, or to extension to a further definite time at the option of the maker or acceptor or automatically upon or after a specified act or event.

"(2) An instrument which by its terms is otherwise payable only upon an act or event uncertain as to time of occurrence is not payable at a definite time even though the act or event has occurred."

UCC 3-105 provides, *inter alia,* that:

"(1) A promise or order otherwise unconditional is not made conditional by the fact that the instrument * * *

"(f) indicates a particular account to be debited or any other fund or source from which reimbursement is expected".

On the other hand, that section also provides that:

"(2) A promise or order is not unconditional if the instrument * * *

"(b) states that it is to be paid only out of a particular fund or source except as provided in this section."

Here, as plaintiff correctly contends, the IAS Court erred in likening the language in the note herein to that in *DH Cattle Holdings Co. v Reinoso (supra).* The note in *Reinoso* had a provision that the final amount of interest to be paid was " '[t]o be determined' " *(DH Cattle Holdings Co. v Reinoso,* 176 AD2d 1057, 1058, *supra)* while the note herein does *not* contain the same or similar language. Defendant did raise the issues of "sum certain" and "definite time" as objections to negotiability before the IAS Court.

However, the issues of definite time and sum certain are intertwined, for when language appears requiring payment "in no event later than [a specified date]", *as does the note*

*herein,* two different aspects of negotiability are resolved. First, the obligation is due at a definite time. Second, since the obligation is rendered certain, it is clear that any reference in the note to a particular fund is not intended to make payment depend upon the adequacy of the fund. *(See, DH Cattle Holdings Co. v Reno, supra,* at 672.)

### (b) Good Faith and Notice/Knowledge

Rabobank took the note in good faith, which is defined as "honesty in fact in the conduct or transaction concerned" (UCC 1-201 [19]). As stated in *Chemical Bank v Haskell* (51 NY2d 85, 91-92, *rearg denied* 51 NY2d 1009), this is a subjective and not an objective standard and, thus, is not what a reasonable banker in Rabobank's position would have known, or would have been led to inquire about, but rather what Rabobank itself actually knew. As in *Haskell,* the testimony of Mr. Barr that Rabobank took the note in good faith is uncontroverted, and thus the burden on this element was sustained *(see, Chemical Bank v Haskell, supra,* at 93).

So, too, with regard to Rabobank's knowledge that the note was overdue or knowledge of claims and defenses. Although Rabobank took the note after an installment was overdue, there is nothing in the record to suggest that it *knew* the note was overdue, or knew of any defenses, *at the time it accepted the assignment (see, DH Cattle Holdings Co. v Barrese,* 191 AD2d 99, 102-103). The correspondence said to be in Rabobank's files upon which defendant relies is all dated *after* the July 18, 1985 assignment.

The IAS Court's reliance on the Delaware County Supreme Court finding that Rabobank had knowledge of defenses based upon a supposed "massive investigation" was misplaced. As noted, the Appellate Division, Third Department, reversed that order relied upon by the IAS Court herein on different grounds, finding it unnecessary to reach the question of whether Rabobank was a holder in due course because defendants failed to establish a "genuine defense" to the notes *(DH Cattle Holdings Co. v Reno, supra,* at 673).

In any event, the premise of both the nisi prius *Reno* Court and the IAS Court was mistaken. No matter how "massive" any investigation by Rabobank, the test for notice is a subjective one requiring actual knowledge, based upon a nonuniform version of UCC 3-304 (7) unique to New York and Virginia. As

stated by now Chief Judge Kaye in *Hartford Acc. & Indem. Co. v American Express Co. (supra,* at 162-163):

"The purpose of UCC 3-304 (7)—unique to New York and Virginia—was to require that questions of notice would be determined by a subjective test of actual knowledge rather than an objective test which might involve constructive knowledge *(Chemical Bank v Haskell,* 51 NY2d 85, 92-93; *see also, Lawton v Walker,* 231 Va 247, 343 SE2d 335 [constructing Va Code Ann § 8.3-304 (7)]). The New York Legislature's addition of a nonuniform subjective test to the code's uniform notice provision signals a deliberate, unmistakable choice to give added protection to good-faith purchasers in this State.

"Thus, UCC 3-304 (7) demands nothing less than actual knowledge of the claim against the instrument or of facts indicating bad faith in taking the instrument *(Chemical Bank v Haskell, supra; First Intl. Bank v Blankstein & Son,* 59 NY2d 436, 445; *Federal Deposit Ins. Corp. v Russo,* 58 NY2d 929, *affd for reasons stated at* 89 AD2d 575). Holders in due course are to be determined by the simple test of what they actually knew, not by speculation as to what they had reason to know, or what would have aroused the suspicion of a reasonable person in their circumstances *(see, First Natl. Bank v Fazzari,* 10 NY2d 394, 399)."

Defendant had asserted in opposition to the plaintiff's cross motion that summary judgment should not be granted in plaintiff's favor without further discovery on the issue of when Rabobank learned of the default or defenses to the note. However, the documents sought by defendant relevant to that issue were previously provided.

Moreover, the IAS Court was engaging in pure speculation as to the existence of a nonrecourse provision in the instant loan documents based only upon the existence of such provision in other litigation involving this plaintiff. Such speculation is an insufficient ground for denial of summary judgment, which must be based upon evidentiary materials submitted in opposition.

In summary, no defense to the note has been demonstrated. Even if it had been, since Rabobank was a holder in due course, plaintiff, as Rabobank's assignee, was also entitled to assert the rights of a holder in due course *(see,* UCC 3-201), thus barring any defense.

Accordingly, the order of the Supreme Court, New York County (Diane A. Lebedeff, J.), entered February 19, 1993,

which, *inter alia,* denied plaintiff's cross motion for summary judgment, should be reversed to the extent appealed from, on the law, and the cross motion for summary judgment granted, with costs and disbursements payable to plaintiff.

ROSENBERGER, J. P., WALLACH and RUBIN, JJ., concur.

Order, Supreme Court, New York County, entered February 19, 1993, reversed to the extent appealed from, on the law, and plaintiff's cross motion for summary judgment granted, with costs and disbursements payable to plaintiff.