[662 NYS2d 8]

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Appellant, v ARTHUR G. ALLEN et al., Respondents.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Appellant, v JAMES R. POPE, Respondent.

First Department, August 21, 1997

## APPEARANCES OF COUNSEL

*James D. Christo* of counsel, New York City *(Richard F. Russell* on the brief; *D'Amato & Lynch,* attorneys), for appellant.

*Martin S. Rothman* of counsel, New York City *(Jeffrey Shernoff* and *Alyne I. Diamond* on the brief; *Greenberg & Shernoff,* and *Seligson, Rothman & Rothman,* New York City, attorneys), for respondents.

## OPINION OF THE COURT

MAZZARELLI, J.

In July 1985, defendants Arthur and Linda Allen (Allens) and defendant James Pope (Pope) (collectively Investors), purchased one-unit interests in a Massachusetts limited partnership known as Hamilton Hotel Partners (Hamilton). A private placement memorandum (PPM) fixed the purchase price at $50,000 per unit, with $12,500 to be paid in cash at the time of purchase, and the remaining $37,500 by way of a promissory note requiring three annual payments of $12,500. The note provided that interest would be payable: "[I]n accordance with the obligations of the payee secured by this Note pursuant to notice from time to time given by Payee to Maker * * * Interest payable hereunder shall be subject to adjustment by Notice to Maker sent or delivered * * * in the sole discretion of the Payee, to reflect the Payee's costs including interest, of Borrowings secured by this Note." Both the Allens and Pope paid the $12,500 down payment and executed promissory notes. When the notes were produced by plaintiff National Union Fire Insurance Co. (National Union), upon commencement of this suit, they included the inscription: "This note bears interest at a rate of 12.5%." The Allens and Pope maintain that

this inscription, which was in a different typeface and was not initialed, was not on the notes when they were signed.

At about the same time the notes were signed, Hamilton sought a financial guarantee bond from National Union to guarantee payment on the promissory notes given by the Investors and others. National Union agreed to bond the notes, with Hamilton as obligee under the bond, only if the Investors executed a pledge to indemnify National Union for any sums paid on the bond. Pope executed an indemnification agreement in favor of National Union on July 18, 1983, and the Allens did so on July 23, 1985. The indemnification agreements, which referenced the Investors' notes as the underlying obligations, included representations that the Investors had "knowledge and experience in financial and business matters" and were "capable of evaluating and ha[ve] evaluated the merits and risks of investment in the Partnership and that [they are] able to bear the economic risk of such investment." On July 30, 1985, National Union issued the financial guarantee bond, with Hamilton as the obligee, and Bancario Sao Paolo di Torino (Bank) as permitted assignee. Hamilton then assigned all the notes to the Bank as consideration for a loan.

By letters dated July 30, 1985, Hamilton informed the Investors of the assignment of the notes to the Bank. The letters included the statement: "The Promissory Note bears interest at 12.50% per annum." There is a space at the bottom of the letters requesting that the investor acknowledge and agree to the assignment. The spaces were left blank, and the Investors deny consenting to the assignment.

Also on July 30, 1985, special counsel for the Bank wrote an opinion letter to the Bank which included a statement that the interest rate on the note was 12.5%, and that any notice or other act by the partnership purporting to fix a different rate would be ineffective. On the same day, National Union issued a surety's certificate acknowledging the discrepancy between the preprinted language in the note that interest would be payable "in accordance with the obligations of the payee * * * pursuant to notice from time to time," and the added inscription on the note calling for a specific 12.5% interest rate. National Union certified that the interest rate on the note was 12.5% regardless of any contrary notice given by Hamilton to the Investors, and that it waived all defenses against the Bank that might arise out of the inconsistencies in the interest rate provisions.

In 1986, Pope informed the Allens that the license of the financial advisor who had recommended the Hamilton invest-

ment to them had been revoked. The Investors demanded withdrawal from the Hamilton investment, and Hamilton granted the Allens' request and returned their investment. While Pope was negotiating with Hamilton for his own release, Hamilton filed for bankruptcy and Pope lost his initial investment. Because the Allens and Pope defaulted on their 1987 and 1988 annual payments on the notes, National Union paid the Bank $30,507.81 on each note pursuant to the bond. Despite National Union's demand, the Investors have refused to reimburse it.

National Union commenced an action against the Allens in February 1993, and against Pope in March 1993, seeking reimbursement both as subrogee of the Bank, and pursuant to the terms of the indemnity agreement. In their answers, the Investors raised affirmative defenses, including that the notes were nonnegotiable due to the absence of a specific interest provision, that they were materially altered to include a specific interest rate, and that National Union and the Bank had notice of defenses to the note and therefore were not holders in due course. Pope also asserted that he had been wrongfully induced into signing the indemnification agreement.

In March 1994, National Union served notices to admit on the investors, requesting admissions that the attached copies of the promissory notes (including the 12.5% interest rate inscription) and the indemnity agreement were executed by them, and that their signatures on the documents were genuine. The Investors failed to respond to the notices to admit for over a year. In May 1995, National Union moved for summary judgment on each complaint. The Investors filed opposing papers, and cross-moved to dismiss the complaint. In their opposition papers, the Investors realleged the fraudulent alteration of the notes and National Union's notice of defenses to them, and added the claim that the indemnification agreements were also tainted by fraud because it was their "understanding and contemplation that the *unaltered* promissory note we signed would be attached to and made part of [the agreement]" (emphasis in original). In supplemental papers, the Investors moved to amend their answers to include a more detailed assertion of fraudulent alteration, and offered a late response to the notice to admit.

In *National Union v Allen*, the IAS Court denied National Union's summary judgment motion, finding a triable issue of fact regarding defendants' central contention that the note was materially and fraudulently altered. The court further found that the notice to admit served by plaintiff was improper

because it went to the very heart of the dispute, and that contrary to plaintiff's argument, the indemnification agreement could not be viewed as an obligation distinct from the note because the agreement was "designed to incorporate the Note."

In *National Union v Pope*, the IAS Court initially granted National Union's motion for summary judgment, finding Pope's failure to respond to the notice to admit dispositive. However, Pope moved for reargument, and upon granting reargument, the court reversed itself and held that Pope had no obligation to respond to a "palpably improper" notice to admit. The court also denied Pope's cross motion to dismiss since there were "material issues of fact regarding the genuineness of the notes and whether the plaintiff is actually a holder in due course."

■ On appeal, National Union first contends that its notices to admit were not improper, and that the investors' untimely responses to them should result in a finding of liability. We disagree. A notice to admit is designed to elicit admissions on matters which the requesting party "reasonably believes there can be no substantial dispute" (CPLR 3123 [a]). Where a notice to admit seeks admissions on matters which go to material or ultimate issues in the case, it is improper (*see, Kimmel v Paul, Weiss, Rifkind, Wharton & Garrison*, 214 AD2d 453; *Zohar v Hair Club For Men*, 200 AD2d 453, 454). The notice here sought, in part, an admission from the investors that they signed the document with the 12.5% interest rate inscription, a fact they have hotly contested throughout this case.

National Union next contends that no material issue of fact exists as to whether the alteration of the notes was fraudulent. The alteration of a negotiable instrument by a holder will result in the discharge of the obligation, against any person other than a holder in due course, *only* where the alteration is both fraudulent and material (UCC 3-407 [2] [a]).* No other alteration results in a discharge (UCC 3-407 [2] [b]). Generally, the alteration of a clause in an instrument relating to interest is a material alteration (3 NY Jur 2d, Alteration of Instruments, § 28, at 505), because it "changes the contract" between the parties (UCC 3-407 [1]). The Investors contend that the addition of the interest rate was both fraudulent and material because it was intended to make the note negotiable, thereby exposing them to increased liability at the hands of third-party holders of the note. National Union argues that the alleged

---

* Massachusetts law, which governs here because the note states so (UCC 1-105 [1]), also requires that an alteration be both material and fraudulent in order to effect a discharge (Mass Annot Laws, ch 106, § 3-407).

alteration was not material because the note itself contemplated the setting of an interest rate at a future time, and because the 12.5% rate was actually *less* than the 13% estimated interest rate in the PPM. On the question of fraudulent intent, National Union asserts that the Investors cannot claim that they relied on the note being nonnegotiable, because the PPM makes repeated references to the notes being negotiable.

We agree with National Union that no fraudulent intent was shown. The addition of the 12.5% interest rate on the note was perfectly consistent with the representations in the PPM, and with the existing provisions in the note calling for an interest rate to be set a future time (*see, NAB Asset Venture III L.P. v Stanley Simon Diamonds,* 236 AD2d 291 [no issue of fact that alleged unilateral insertion of interest rate was either material or fraudulent]). Also, there is no reliance where all the evidence in the record indicates that the note was intended to be negotiable (*see, DH Cattle Holdings Co. v Smith,* 195 AD2d 202, 208). While the Investors characterize these provisions as indefinite and whimsical, it remains that they signed the notes with those provisions in it. Thus, they can hardly claim surprise that a specific interest rate was added subsequent to their execution of the notes.

It is true that fraudulent intent is generally a question of fact. However, the Investors have provided no evidence to support their claim that the note was altered to make it negotiable (*see, Sterling Natl. Bank & Trust Co. v Fidelity Mtge. Investors,* 510 F2d 870 [2d Cir 1975]). The surety's certificate is not the "smoking gun" the Investors allege it is, as it merely evinces National Union and the Bank's knowledge of an ambiguity between the interest provisions, and National Union's assurance that it would waive any defenses vis-à-vis the Bank based on this ambiguity. Indeed, that the Investors were informed of the 12.5% interest rate in the letter apprising them of the assignment of the note suggests that there was no attempt to surreptitiously alter the terms of the note (*supra,* at 875).

The Investors also contend that the unaltered note was not a negotiable instrument. They argue this because the unaltered note had no specific interest rate on its face, and none was readily ascertainable by reference to an external source (UCC 3-106 [1] [a]; [2]). Thus, they contend the note was not an "unconditional promise or order to pay a sum certain"

(UCC 3-104 [1] [b]; 3-106 [1], [2]), but an ordinary contract subject to all defenses. However, as stated above, no triable issue of fact has been raised as to the claim of fraudulent alteration. Further, UCC 3-115 (1) provides that an incomplete, signed instrument may subsequently become negotiable if "it is completed in accordance with authority given it." National Union correctly argues that all the evidence in this record demonstrates that the addition of the 12.5% interest rate constituted an authorized completion of the note. Finally, the burden of establishing that the completion was unauthorized lies squarely with the party so asserting, the Investors in the instant case. Clearly, there is no material issue of fact regarding the negotiability of the note (*see, A.I. Trade Fin. v Laminaciones de Lesaca,* 41 F3d 830, 836; *Indemnity Ins. Co. v American Deseret Ltd. Partnership,* 1990 US Dist LEXIS 17464 [SD NY, Dec. 27, 1990, Mukasey, J.]).

Even if the note had been fraudulently and materially altered, it would still be enforceable by subsequent holders in due course (UCC 3-407 [2], [3]). While the parties disagree as to whether the Bank was a holder in due course, that question is not dispositive here. "UCC 3-307 (2) provides that when a holder produces a properly signed instrument, it is entitled to recover on it unless the defendant establishes a genuine defense. When such a genuine defense is established, the burden then shifts to the holder to establish its status as holder in due course (UCC 3-307 [3])." (*DH Cattle Holdings Co. v Smith, supra,* at 207; *see also, First Intl. Bank v Blankstein & Son,* 59 NY2d 436, 444; *A.I. Trade Fin. v Laminaciones de Lesaca, supra,* at 836-837). Because the Investors have failed to raise a triable issue of fact regarding any fraudulent alteration of the notes, the only defense alleged, the burden never shifted to National Union to establish that the Bank was a holder in due course (*DH Cattle Holdings Co. v Smith, supra*).

National Union further argues that notwithstanding any alleged fraud regarding the note, it is independently entitled to summary judgment based on the indemnification agreement. The Investors maintain, and the IAS Court agreed, that the documents must be read together, such that if the note was fraudulently altered, the indemnification agreement would also be unenforceable. "In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances" (*Rudman v Cowles Communications,* 30 NY2d 1, 13; *National Union Fire Ins. Co. v Turtur,* 892 F2d 199, 204). The issue of separabil-

ity is ordinarily a question of fact (*Rudman v Cowles Communications, supra,* at 13).

Relying on the Second Circuit Court of Appeals decision in *National Union Fire Ins. Co. v Turtur* (*supra* [hereinafter *Turtur*]), the Investors argue that an issue of fact exists as to separability. *Turtur* involved exactly the same type of bonded investment as this case, where the investors signed a promissory note for the balance of the purchase price of their partnership interest, the surety issued a bond guaranteeing payment on the notes, and the investors signed separate indemnification agreements with the sureties. The investors in *Turtur* alleged that they were fraudulently induced into purchasing their limited partnership interest, and that National Union (also the surety in that case) was aware of the facts underlying the fraudulent inducement claim. The Second Circuit held that since the investor alleged that he signed the promissory note and the indemnification agreements "as part of one whole transaction" in order to purchase its partnership interest, summary judgment was inappropriate on National Union's claim under the indemnification agreement because there were issues of fact as to the separability of the agreements (*supra,* at 205).

National Union relies on this Court's decision in *National Union Fire Ins. Co. v Williams* (223 AD2d 395) for the opposite conclusion that the note and the indemnification agreement were separate. *Williams* (*supra*) also involved an investment in a limited partnership with a promissory note and indemnification agreement. The separability question arose because the forum selection clauses were different. In describing the relationship between the two agreements, this Court stated:

"While the respective agreements are unquestionably part of the same overall transaction, each involves different parties and serves a distinct purpose * * *

"[National Union's] involvement in the subject transaction is peripheral, even with respect to the related financing obtained from the lender pursuant to the notes. Plaintiff is merely the guarantor of payment on the notes, an obligation that runs only nominally to the limited partnership * * *

"[The investors] obviously derived a benefit from the guarantee of their credit and, given [National Union's] peripheral involvement in the transaction, they will not be heard to belatedly complain that the indemnification agreements are tainted by illegality." (*Supra,* at 396-397.)

■ Our holding in *Williams* is dispositive on the question of the separability of these agreements. As in *Williams*, the notes

and indemnification agreements herein involved different parties and served distinct purposes. National Union played no role in the Investors' decision to purchase their partnership interests, nor did it participate in the setting of the interest rates on the notes. It merely acted as guarantor of the notes, and sought indemnity protection from the investors in the case of their default. The plain and express purpose of the indemnification agreements was to permit National Union to proceed directly against the Investors, irrespective of any defense they might have to the notes, in the event the Investors defaulted and their surety obligations were triggered. Conversely, the indemnification agreement would serve no purpose if defenses asserted against the *notes* would allow the Investors to evade their obligations under the indemnification agreements. Contrary to Pope's claim, there is no evidence that the separate indemnity agreements were procured by fraud. Accordingly, National Union should have been granted summary judgment on those causes of action.

Accordingly, the order of the Supreme Court, New York County (Charles Ramos, J.), entered March 15, 1996, which, *inter alia*, denied plaintiff's motion for an order dismissing defendants' affirmative defenses and for summary judgment on its complaint, should be reversed, on the law, with costs, plaintiff's motion for summary judgment is granted, and the Clerk is directed to enter judgment in favor of the plaintiff in the amount of $30,507.81, plus interest, and order, same court (Leland DeGrasse, J.), entered on or about April 1, 1996, which, to the extent appealed from, granted defendant Pope's motion for reargument of a prior order granting summary judgment to plaintiff, and, upon reargument, denied plaintiff's motion for summary judgment, should be modified, on the law, plaintiff's motion for summary judgment is granted, and otherwise affirmed, with costs to plaintiff, and the Clerk is directed to enter judgment in favor of the plaintiff in the amount of $30,507.81, plus interest. In both matters, the balance of plaintiff's claims for attorneys' fees and expenses are severed and remanded for assessment in further proceedings.

MILONAS, J. P., ELLERIN and TOM, JJ., concur.

Order, Supreme Court, New York County, entered March 15, 1996, which, *inter alia,* denied plaintiff's motion for an order dismissing the Allen defendants' affirmative defenses and for summary judgment on its complaint, reversed, on the law, with costs, plaintiff's motion for summary judgment granted,

and the Clerk is directed to enter judgment in favor of the plaintiff in the amount of $30,507.81, plus interest, and order, same court, entered on or about April 1, 1996, modified, on the law, plaintiff's motion for summary judgment granted, and otherwise affirmed, with costs to plaintiff, and the Clerk is directed to enter judgment in favor of the plaintiff in the amount of $30,507.81, plus interest. In both matters, the balance of plaintiff's claims for attorneys' fees and expenses are severed and remanded for assessment in further proceedings. [As amended by unpublished order entered January 20, 1998.]