**A.I. TRADE FINANCE, INC.,**
**Plaintiff–Appellee,**

v.

**LAMINACIONES de LESACA, S.A. and Altos Hornos de Vizcaya, S.A., Defendants–Appellants.**

**No. 390.**
**Docket 94–7145.**

United States Court of Appeals, Second Circuit.

Argued Sept. 1, 1994.

Decided Dec. 1, 1994.

Martin Domb, New York City (Frank H. Loomis, Hill, Betts & Nash, on the brief), for plaintiff-appellee.

John M. Toriello, New York City (Juan A. Anduiza, Marisa A. Marinelli, Mary Lynn Nicholas, Haight, Gardner, Poor & Havens, on the brief), for defendants-appellants.

Before NEWMAN, Chief Judge, KEARSE and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Laminaciones de Lesaca, S.A. ("Laminaciones"), and its parent company, Altos Hornos de Vizcaya, S.A. ("Altos Hornos"), appeal from a final judgment of the United States District Court for the South-

ern District of New York, Michael B. Mukasey, Judge, awarding plaintiff A.I. Trade Finance, Inc. ("AITF"), $1,434,692.70, plus interest and costs, against defendants as the maker and guarantor, respectively, of promissory notes issued for the purchase of equipment. 840 F.Supp. 271. Notwithstanding defendants' contention, *inter alia,* that the seller of the equipment had breached the underlying commercial contract, the district court granted summary judgment to AITF on the ground that it was a holder in due course within the meaning of § 3–302(1) of the pre–1990 version of the Uniform Commercial Code ("UCC") as adopted in New York (McKinney 1991) ("NYUCC" or "Code"), and hence was not subject to defendants' defenses against the seller. On appeal, defendants contend principally that AITF is not a holder in due course, and that even if it is, it is not immune from their defenses because AITF had "dealt" with defendants within the meaning of NYUCC § 3–305(2). For the reasons below, we disagree and affirm the judgment of the district court.

## I. BACKGROUND

The events are not in dispute. In August 1990, defendants agreed to purchase certain steel processing machinery called a "slitting line" from Delta Brands, Inc. ("Delta"), a Texas-based exporter, for Laminaciones's factory in Spain. Delta asked AITF, a trade finance company specializing in international transactions, to finance the transaction.

### A. *The Agreements*

During negotiations with respect to the terms of the transaction, AITF representative Richard Tull traveled to Spain to attend a two-day series of meetings between Delta and defendants. The meetings concerning the underlying commercial transaction between Delta and defendants were conducted in Spanish without an interpreter. Tull, who did not speak Spanish, met separately with a Delta official and representatives of Altos Hornos's finance department to discuss in English the specific terms for financing the transaction.

The meetings culminated in, *inter alia,* an August 8, 1990 agreement between Laminaciones and Delta (the "equipment contract" or "commercial contract"), pursuant to which Delta was to deliver and install the machinery, and Laminaciones was to pay Delta 15 percent of the contract price within 60 days of the effective date of the contract, and to pay the balance in 10 semi-annual installments dating from shipment, plus interest calculated at 12 percent per annum on the outstanding balance. As evidence of the debt, Laminaciones was to issue to Delta 10 promissory notes for the appropriate amounts, with Altos Hornos cosigning as guarantor, to be payable at intervals commencing six months from the date of Delta's shipment of the equipment from Texas. Laminaciones agreed to deliver the notes, signed but with their maturity dates left blank, to a United States bank, with irrevocable instructions for the notes' completion and their delivery to Delta "against shipping documents for the equipment contemplated by the Contract."

AITF agreed to buy the Laminaciones notes from Delta. This agreement was eventually formalized in a November 27, 1990 letter of commitment signed by AITF and Delta (the "commitment letter"). The commitment letter provided that shipment of the machinery would occur on approximately March 20, 1991, "with promissory notes to be available to AITF for discounting not later than 4.12.91."

AITF furnished defendants with standard promissory note forms to be used, one of which was annexed to the commercial contract. It also furnished Altos Hornos with a letter dated August 8, 1990, referring to the "financing which we are providing to Altos Hornos de Vizcaya, S.A. on behalf of Delta Brands, Inc.," and stating that in the event that AITF elected to sell the notes after acquiring them from Delta, Altos Hornos would have a right of first refusal. Laminaciones and Altos Hornos, by letter to AITF dated March 25, 1991, "confirm[ed] that nothing in the commercial contract impairs the negotiability of the financial obligation." In the same letter, Laminaciones and Altos Hornos also "consent[ed] to the financial obligation being governed by New York law and

the place of non-exclusive jurisdiction being the state and federal courts located therein."

## B. *Performance and Non–Performance*

In February 1991, Laminaciones delivered its 10 promissory notes to its bank in New York, Banco Bilbao Vizcaya ("Banco Bilbao"), with irrevocable instructions to enter the appropriate maturity dates and release the notes to Delta upon Delta's presentation of documents showing that all of the equipment had been shipped. Laminaciones instructed Banco Bilbao that the maturity date of the first note was to be 182 days from the date on the bill of lading for "the *last departure* which completes the total value of the ... contract." (Emphasis in original.)

On February 27, 1991, AITF sent Delta a letter reminding it that, in accordance with the commitment letter, the promissory notes "must be presented to A.I. Trade Finance, Inc. in acceptable form by April 12, 1991." AITF's February 1991 letter stated that AITF would not extend its commitment beyond the April 12 date.

In April 1991, Delta presented to Banco Bilbao, *inter alia*, a bill of lading dated April 1, 1991, and an invoice indicating that a "slitting line with new shear" had been shipped to Laminaciones and showing the entire balance of the purchase price as due. Based on the documents presented, Banco Bilbao filled in the maturity dates of the 10 promissory notes, with the first note bearing a maturity date of September 30, 1991, *i.e.,* 182 days from the bill-of-lading date, and released the notes to Delta. On receipt of the notes, Delta immediately endorsed and sold them to AITF for $3,081,438.68. When AITF presented the first note on or about its September 30, 1991 maturity date, Laminaciones promptly paid the amount of that note without objection.

However, at the time the invoice, bill of lading, and other documents were presented to Banco Bilbao in April 1991, Delta had not in fact shipped all of the machinery due Laminaciones under the equipment contract. Several shipments were made after the date indicated in the bill of lading. In a September 1991 letter to Delta, Altos Hornos stated that the maturity dates on the notes should not have been calculated prior to the date of Delta's final shipment, and it asked Delta to pay the excess interest accrued under the notes. With respect to the first note, Delta complied with Altos Hornos's request by paying an adjustment of interest totaling $24,000.

Some of the machinery called for by the equipment contract was never delivered, and in March 1992, Laminaciones canceled the contract. When AITF presented Laminaciones's second note for payment after it matured on April 1, 1992, Laminaciones declined to pay it. AITF thereafter demanded payment from Altos Hornos pursuant to the guarantee; Altos Hornos responded by telex dated June 4, 1992, stating that "due to a temporary break on the part of Delta Brands Inc [*sic*] in complying with its obligations, payment of the due promissory note number 2/10 has been suspended as a precaution." Since then, additional notes have reached maturity; no further payments have been made.

## C. *The Present Lawsuit and the District Court's Ruling*

When further efforts to collect proved unsuccessful, AITF commenced the present action against Laminaciones and Altos Hornos to enforce the notes. Defendants took the position, *inter alia*, that no payments were due on the promissory notes (1) because Banco Bilbao had not followed Laminaciones's instructions to make the first maturity date 182 days after Delta's "*last*" shipment, and (2) because Delta had submitted fraudulent shipping documents in order to procure the notes. Both sides moved for summary judgment.

AITF, in support of summary judgment in its favor, contended that as a good-faith purchaser of the notes from Delta, AITF was a holder in due course under NYUCC § 3–302(1) and was entitled to payment from the maker and guarantor of the notes notwithstanding any defenses the maker and guarantor might have against Delta. Defendants contended that they were entitled to summary judgment in their favor principally on the grounds (1) that the notes were not

negotiable instruments, and (2) that even if they were negotiable and AITF were a holder in due course, AITF was subject to the defenses defendants could assert against Delta because AITF had been involved in negotiating the transaction with defendants, and NYUCC § 3–305(2) does not immunize a holder in due course against the defenses of a party to the instrument with whom the holder has "dealt."

In an Opinion and Order dated December 27, 1993, published at 840 F.Supp. 271, the district court denied defendants' motion and granted that of AITF, holding that AITF was a holder in due course within the meaning of NYUCC § 3–302(1) and was therefore not subject to any defenses defendants might have against Delta. The court concluded that the limiting language of NYUCC § 3–305(2) does not apply to a party that was involved only in the financing aspects of a commercial transaction. It further noted that the present case concerned a transnational "à forfait" transaction, in which a trade finance company commonly " 'become[s] involved ... shortly after the commercial terms are worked out' " between the importer and the exporter, and thereafter negotiates the credit terms with the maker and guarantor of the documents evidencing the debt. 840 F.Supp. at 274 (quoting A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 78 (2d Cir.1993)). The court concluded that a rule limiting the scope of AITF's rights as a holder-in-due-course would force forfaiters generally to alter their established practices, thereby reducing the availability of commercial credit, contrary to the underlying objectives of the UCC.

In sum, the district court held that, because AITF had not participated in negotiating the terms of the underlying commercial transaction between Delta and Laminaciones and Altos Hornos, and because AITF had satisfied the other requirements for holder-in-due-course status, Laminaciones and Altos Hornos must make payment on those notes that had matured. This appeal followed.

## II. DISCUSSION

On appeal, defendants pursue their contention that AITF is subject to their defenses against Delta for breach of the equipment contract, arguing chiefly that (1) under established New York law, AITF is not a holder-in-due-course, and (2) even if it is, it "dealt" with Laminaciones and Altos Hornos within the meaning of NYUCC § 3–305(2) and hence is deprived of normal holder-in-due-course immunity from those defenses. In addition, defendants argue that AITF could not be a holder in due course because it had "close connections" with Delta. We find no merit in these contentions.

### A. "Negotiability" and AITF's Status as a Holder in Due Course

To be "negotiable" under the NYUCC, an instrument must (1) "be signed by the maker or drawer," (2) "contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by [NYUCC Article 3]," (3) "be payable on demand or at a definite time," and (4) be payable to the payee's "order" or to the instrument's "bearer." NYUCC § 3–104(1). A purchaser of a negotiable instrument becomes a holder in due course if he "takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." NYUCC § 3–302(1). Section 3–305 provides, subject to certain exceptions not pertinent here, that a holder in due course "takes the instrument free from (1) all claims to it on the part of any person; and (2) all defenses of any party to the instrument with whom the holder has not dealt." Id. §§ 3–305(1) and (2).

Defendants contend that AITF is not a holder in due course because (a) the promises reflected in Laminaciones's notes, being premised on Delta's satisfaction of several requirements before the notes could issue, were "conditional," and the notes were therefore nonnegotiable; (b) AITF did not show that it purchased the notes in good faith; and (c) AITF did not show that it had no notice of Delta's breach. These contentions must be rejected.

### 1. *Negotiability*

 The requirements for negotiability set out in § 3–104(1) of the Code concern the form and content of the instrument itself. *See, e.g., DH Cattle Holdings Co. v. Smith,* 195 A.D.2d 202, 209–10, 607 N.Y.S.2d 227, 231–32 (1st Dep't 1994); *see also* NYUCC § 3–105 cmt. 8 (holder of a negotiable instrument must be able to "ascertain all of its essential terms from its face"). While the indicia of negotiability must be visible on the face of the instrument, a note containing an otherwise unconditional promise is not made conditional merely because it refers to, or states that it arises from, a separate agreement or transaction. *See* NYUCC §§ 3–105(1)(b), (c); *id.* cmt. 3 (reference to separate agreement does not limit terms of payment "in the absence of any express statement to that effect").

 Further, the Code provides that an instrument may subsequently become negotiable even though it lacks a prerequisite of negotiability at the time it is signed. Section 3–115(1) states:

> When a paper whose contents at the time of signing show that it is intended to become [a negotiable] instrument is signed while still incomplete in any necessary respect it cannot be enforced until completed, but when it is completed in accordance with authority given it is effective as completed.

*Id.* § 3–115(1). *See also id.* § 3–304(4)(d) (purchaser's knowledge that an incomplete instrument was completed after signing but prior to purchase does not constitute notice of a defense or claim, "unless the purchaser has notice of any improper completion"). Thus, a condition precedent to the completion of a note does not preclude its ultimate negotiability, provided that the note is otherwise negotiable and is eventually "completed in accordance with authority given." *Id.* § 3–115(1).

 Similarly, the failure of a condition that is not visible on the face of a completed ·promissory note does not make the note non-negotiable; rather, the failure creates a defense that is available only against a holder who is not a holder in due course. *See* NYUCC § 3–306(c) (non-due-course holder takes instrument subject to, *inter alia,* defense of nonperformance of condition precedent); *Amirana v. Howland,* 202 A.D.2d 783, 784, 609 N.Y.S.2d 96, 97–98 (3d Dep't 1994).

The district court correctly rejected defendants' contention that the promissory notes issued by Laminaciones were not negotiable. The 10 notes were signed by Laminaciones and by Altos Hornos; each note contained an unconditional promise to pay a precise sum to the order of Delta, and contained no other promise; and, after completion by defendants' agent Banco Bilbao, each note showed the precise date on which payment of the specified sum was due. Banco Bilbao had authority from defendants to fill in each note's maturity date upon presentation by Delta of evidence that all of the machinery called for by the contract had been shipped, and to set the due dates at specified intervals from the date of Delta's bill of lading. Upon Delta's presentation of the documentation required by defendants, the notes were completed by Banco Bilbao in accordance with this authority and thereby became fully effective. The notes themselves do not refer to any condition in the underlying equipment contract; nor is any necessary term determinable only by reference to an extrinsic fact that is not revealed on the face of the notes. Given the precise terms on the face of the notes, the mere reference to the bill-of-lading date did not impair the notes' negotiability.

### 2. *Notice and Good Faith*

 If the maker of a negotiable instrument has shown the existence of a defense, a holder who wishes to cut off that defense by claiming holder-in-due course immunity has the ultimate burden of establishing by a preponderance of the total evidence that he purchased the instrument for value, in good faith, and without notice. *See* NYUCC § 3–307(3) & cmt. 3. The holder's initial burden on the issues of notice and good faith, however, is "a slight one" that may be satisfied by his affidavit disclaiming any knowledge of the maker's defense when the notes were negotiated. *First International Bank, Ltd. v. L. Blankstein & Son, Inc.,* 59 N.Y.2d 436, 444, 465 N.Y.S.2d 888, 892, 452 N.E.2d 1216, 1220

(1983). Such an affidavit, "[w]hile necessarily conclusory in form," may nevertheless be enough to place on the maker the burden of coming forward with evidence sufficient to raise a genuine issue as to the holder's notice of defenses. *Id.* Since documentary proof as to notice will ordinarily be in the hands of the maker, the holder will be entitled to summary judgment based on such an affidavit unless the maker proffers evidence of facts that, if accepted, would establish the holder's notice of a valid defense. *See id.*

■ The purchaser of a note has notice of a claim or defense if, at the time he purchases the instrument, he has "knowledge of the claim or defense or knowledge of such facts that his action in taking the instrument amounts to bad faith." NYUCC § 3–304(7). In determining whether a party had notice, the New York Court of Appeals has held that this section, a nonuniform provision of the pre–1990 version of the UCC, requires application of " 'a subjective test of actual knowledge rather than an objective test which might involve constructive knowledge.' " *See Carrefour U.S.A. Properties Inc. v. 110 Sand Co.*, 918 F.2d 345, 347 (2d Cir.1990) (quoting *Hartford Accident & Indemnity Co. v. American Express Co.*, 74 N.Y.2d 153, 162, 544 N.Y.S.2d 573, 578, 542 N.E.2d 1090, 1094–95 (1989)). "Holders in due course are to be determined by the simple test of what they actually knew, not by speculation as to what they had reason to know, or what would have aroused the suspicion of a reasonable person in their circumstances...." *Id.* at 163, 544 N.Y.S.2d at 578, 542 N.E.2d at 1094; *see also Carrefour U.S.A. Properties Inc. v. 110 Sand Co.*, 918 F.2d at 348–49; *Chemical Bank v. Haskell*, 51 N.Y.2d 85, 93, 432 N.Y.S.2d 478, 481, 411 N.E.2d 1339, 1341–42 (1980).

■ An equivalent standard governs the Code's requirement of "good faith." That term is defined as "honesty in fact in the conduct or transaction concerned." NYUCC § 1–201(19). In evaluating a party's good faith, "the inquiry is what [the holder] actually knew." *Chemical Bank v. Haskell*, 51 N.Y.2d at 92, 432 N.Y.S.2d at 480, 411 N.E.2d at 1341. If a holder "did not have actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments, then its good faith [is] sufficiently shown." *Id.*

Within this framework, the district court correctly concluded that AITF had satisfied its burden of proving that it took the notes in good faith and without notice of any valid defenses. AITF supported its summary judgment motion with the affirmations of two of its assistant vice presidents, who had approved AITF's payment for the notes to Delta. Both officers stated that AITF had purchased the notes in good faith, paying $3,081,438.68 for them, and that neither they nor, to their knowledge, any other AITF employee or agent knew of any defenses that defendants might have had against Delta at the time AITF purchased the notes from Delta. This sufficed to meet AITF's initial burden of proving its good faith and its lack of actual notice of Delta's breach.

Defendants' contention that AITF purchased the notes with notice of Delta's breach was not supported by evidence sufficient to create a genuine issue to be tried. Although, as defendants argue, AITF was aware that the release of the notes to Delta was subject to a condition precedent, the awareness of the existence of a condition is insufficient to suggest an awareness that the condition was not fulfilled. Defendants also point to AITF's February 27, 1991 letter to Delta, which stated that AITF would not extend its agreement to purchase the notes beyond the April 12 date set by the commitment letter; they apparently argue that it can be inferred from the February 1991 letter that AITF knew Delta was having difficulty in meeting its obligations under the equipment contract. Even assuming that such an inference were justified, however, under New York law AITF had no responsibility to inquire whether Delta thereafter in fact performed. The facts cited by defendants thus failed to create any triable issue concerning AITF's actual knowledge at the time it purchased the notes.

In sum, we find no error in the district court's conclusion that AITF purchased the notes from Delta as a holder in due course.

## B. The "Dealt [With]" Doctrine

Defendants contend that even if AITF is a holder in due course, it is not entitled to recover because it "dealt" with defendants, within the meaning of NYUCC § 3–305(2), in negotiating the terms of the promissory notes. They also take issue with the district court's concern that denial of holder-in-due-course immunity to AITF here might unduly discourage commercial "à forfait" transactions, contending that forfaiting is so rarely used in the United States that "it can hardly be [considered] one of those types of financings that were sought to be encouraged by the Code." (Defendants' brief on appeal at 10.) We reject these contentions because they hinge on a literal interpretation of "dealt [with]" that does not accord with New York law.

Section 3–305(2) provides, with exceptions not pertinent here, that "[t]o the extent that a holder is a holder in due course he takes the instrument free from ... all defenses of any party to the instrument with whom the holder has not dealt ...." NYUCC § 3–305(2) (the "'dealt [with]'" provision). The official comment to this section does not explain the intended scope of the "dealt [with]" provision. The courts have reasoned, however, that that part of § 3–305(2) was not meant to be given literal or unlimited application, for UCC § 3–302(2) provides that the holder of a negotiable instrument may, if he satisfies the prerequisites set out in § 3–302(1), be a holder in due course even though he is the payee. NYUCC § 3–302(2); see, e.g., Chicago Title & Trust Co. v. Walsh, 34 Ill.App.3d 458, 469, 340 N.E.2d 106, 114 (1975). Further, the official commentary to the latter section notes that such a payee is entitled to holder-in-due-course status regardless of "whether he takes the instrument by purchase from a third person or directly from the obligor." NYUCC § 3–302(2) cmt. 2 (emphasis added). Thus, a literal application of the "dealt [with]" provision of § 3–305(2) would nullify so much of § 3–302(2) as is designed to accord holder-in-due-course status to a payee who has purchased the instrument directly from the obligor.

Instead, the "dealt [with]" provision of § 3–305(2) has been viewed as a limited restriction on § 3–302(2), to be applied to deny holders in due course their normal immunity only when they are found to have been "so involved with the disputed transaction that they should not be free from defenses." Chicago Title & Trust Co. v. Walsh, 34 Ill.App.3d at 468, 340 N.E.2d at 113; see also New Bedford Institution for Savings v. Gildroy, 36 Mass.App.Ct. 647, 654–55, 634 N.E.2d 920, 926, review denied, 418 Mass. 1106, 639 N.E.2d 1082 (1994); Village Motors, Inc. v. American Federal Savings & Loan Association, 231 Va. 408, 411–12, 345 S.E.2d 288, 290 (1986). Thus, the "dealt [with]" provision is frequently applied to deny holder-in-due-course immunity to a holder payee who was a party to the underlying commercial transaction with the instrument's maker, for in those circumstances if there is a failure of consideration in the underlying transaction, the payee will likely be aware of it. See, e.g., New Bedford Institution for Savings v. Gildroy, 36 Mass.App. Ct. at 655, 634 N.E.2d at 926 ("dealt [with]" exception applies only to payees "so directly and personally involved with the disputed aspects of the transaction as to be charged with knowledge of any fraud or other irregularity"); James Pair, Inc. v. Gentry, 134 Ga.App. 734, 734–35, 215 S.E.2d 707, 707–08 (1975) (§ 3–305(2) precludes holder-in-due-course immunity for payee who induced promisor to sign note based on misrepresentation that payments would later be refunded); Brotherton v. McWaters, 438 P.2d 1, 3–4 (Okla.1968) (similar preclusion of immunity for payee of check drawn in payment for payee's allegedly faulty repairs). As thus applied, the "dealt [with]" provision denies holder-in-due-course immunity to a person who had such intimate involvement in the underlying transaction as to warrant imputing to him knowledge of its irregularities—an application that essentially replicates two of the preconditions to achievement of holder-in-due-course status, i.e., that the holder must take the instrument in good faith and without notice of defenses.

This view that the "dealt [with]" provision largely mirrors the § 3–302(1) analysis of good faith and notice finds support in the 1990 revision of Article 3 of the UCC—a

revision not adopted in New York—which eliminated the "dealt [with]" language of UCC § 3–305(2) as unnecessary. The revised version, instead of denying the normal holder-in-due-course immunity to holders in due course who have "dealt [with]" the obligor, provides more simply that a holder in due course shall not be "subject to defenses of the obligor ... *against a person other than the holder."* UCC § 3–305(b), 2 U.L.A. 72 (1991) (emphasis added). The Official Comment to the revised § 3–305 explains that the language of the prior § 3–305(2) "was not at all clear and if read literally could have produced the wrong result.... It is not necessary." *Id.* cmt. 2, 2 U.L.A. 74 (1991). *See also* 1B J. White & R. Summers, *Uniform Commercial Code* § 14–5, at 50 (3d ed. 1993) (suggesting that "the new language [of § 3–305] ... will make it easier to reach the right result" and inferring that there had been no "significant changes in policy or substance").

Defendants in the present case, noting that the 1990 revision has not been adopted in New York, and relying principally on *Fazio v. Loweth,* 112 A.D.2d 135, 490 N.Y.S.2d 859 (2d Dep't 1985) ("*Fazio*"), argue that we should apply the undisturbed "dealt [with]" provision literally. We disagree for several reasons: (a) the *Fazio* statement on which defendants rely was superfluous dictum; (b) in the circumstances of *Fazio* itself, application of the "dealt [with]" provision would have, consistent with both the prevailing interpretation of § 3–305(2) and the premises of the 1990 revision, resulted in the denial of holder-in-due-course status, not just the denial of holder-in-due-course immunity to one having that status; and (c) in other circumstances, the New York courts have not applied the provision literally.

In *Fazio,* the plaintiff, claiming to be a holder in due course, sought summary judgment enforcing a dated document bearing "what seem[ed] to be the signature of Dominic Loweth," stating, " '[t]his is to certify that I borrowed $15,000 from Philip N. Fazio on this day to be returned within 10 days.' " *Id.* at 135, 490 N.Y.S.2d at 860. The Appellate Division upheld the denial of summary judgment, holding that the document was not a negotiable instrument because it was "not payable to order or to bearer and hence does not fulfill the requirements of UCC 3–104(1)(d)." 112 A.D.2d at 136, 490 N.Y.S.2d at 861. Since the document was not a negotiable instrument, the plaintiff could not be a holder in due course.

After so holding, the *Fazio* court noted that even if the document had been a negotiable instrument, there were other possible defects in the plaintiff's case. In the statement on which defendants focus, the court stated that "even were plaintiff to be considered a holder in due course, he would still be subject to any valid defense asserted by defendant Loweth because Loweth is a party with whom he has dealt (*see,* UCC 3–305[2] )." 112 A.D.2d at 136, 490 N.Y.S.2d at 861. The court went on to observe, however, that Fazio might have been precluded from even becoming a holder in due course because Loweth claimed to have been acting merely as a messenger who had signed a receipt for a check made out to Loweth's employer and claimed that the paper on which Fazio based his suit was not the paper Loweth had signed. The *Fazio* court noted that if Loweth's version of the facts were true, "it would have been impossible for plaintiff not to have knowledge of the defense asserted by Loweth." 112 A.D.2d at 137, 490 N.Y.S.2d at 861. Given the fraud claimed in *Fazio,* it seems clear that any application of the "dealt [with]" provision would have been no more than a replication of the initial holder-in-due-course inquiry.

Further, even if the dictum of the Appellate Division in *Fazio* could be read as suggesting a literal application of the "dealt [with]" provision to circumstances other than those confronting the *Fazio* court, that provision has not been so applied. Prior to *Fazio,* New York courts had, consistent with the actual-knowledge standard discussed in Part II.A.2. above, rejected any blanket exclusion from holder-in-due-course status for "all payees with a definable relation to the underlying transaction." *Saale v. Interstate Steel Co.,* 27 A.D.2d 1, 5, 275 N.Y.S.2d 532, 535 (1st Dep't 1966) ("*Saale* "), *aff'd,* 19 N.Y.2d 933, 281 N.Y.S.2d 340, 228 N.E.2d 397 (1967). In *Saale,* which involved an alleged fraudulent

substitution of goods, the plaintiff, who had technical title to goods that were put up for salvage sale by its insurer, was not involved in the sale transaction until the defendants sought to buy the goods on credit. The plaintiff and the defendants then negotiated credit terms that resulted in the corporate defendant's issuance of promissory notes payable to the plaintiff. The *Saale* court noted the plaintiff's very limited role in the transaction, pointing out that "[o]nly after the sale and because defendant sought credit was plaintiff brought back into the picture"; and it noted that there was "no suggestion anywhere that plaintiff played any knowing role in the underlying transaction." 27 A.D.2d at 3, 275 N.Y.S.2d at 534. Stating that "[n]o one has suggested that being a party to the underlying transaction bars the holder from being one in due course," *id.* at 4, 275 N.Y.S.2d at 535, the court held that the plaintiff was a holder in due course and was not subject to the defendant's defense of fraudulent substitution. Plainly the *Saale* court concluded that holder-in-due-course immunity is available notwithstanding the holder's having dealt directly with the promisor in the negotiation of credit terms, so long as the holder's role in the underlying transaction was limited and the holder had no notice of any defects in that transaction. On appeal, the New York Court of Appeals, after briefly describing the facts, affirmed *Saale* on the opinion of the Appellate Division. *See Saale v. Interstate Steel Co.,* 19 N.Y.2d 933, 281 N.Y.S.2d 340, 228 N.E.2d 397 (1967).

Thus, though the courts in *Saale* did not directly address § 3–305(2), their holding was consistent with both (a) the general view that the "dealt [with]" limitation is essentially the equivalent of the good-faith and lack-of-notice requirements, and (b) the 1990 revision's premises that the "dealt [with]" provision should not be taken literally and, if applied properly, is unnecessary. The correctness of this interpretation of *Saale,* and the viability of its holding notwithstanding the 1985 dictum in *Fazio,* are confirmed by the New York Court of Appeals discussion in *Hartford Accident & Indemnity Co. v. American Express Co.,* 74 N.Y.2d at 159, 544 N.Y.S.2d at 576, 542 N.E.2d at 1092–93, a 1989 decision. The *Hartford* court, after not-

ing the requirements for holder-in-due-course status, including good faith and lack of notice, stated, citing its affirmance of *Saale,* that "[s]atisfaction of these requirements is all that is necessary for a payee to obtain the special protections of a holder in due course." *Id.* at 159, 544 N.Y.S.2d at 576, 542 N.E.2d at 1093 (emphasis added).

In sum, we conclude that under New York law, a holder's having participated in the financing aspects of an underlying commercial transaction does not compromise his holder-in-due-course status or immunity, provided that his involvement did not result in actual notice of defenses to the underlying contract. Since, as discussed in Part II.A.2. above, defendants failed to present facts sufficient to create a triable issue as to AITF's good faith or lack of notice, we conclude that their "dealt [with]" defense must also fail.

## C. *The "Close–Connectedness" Theory*

█ Finally, defendants contend that AITF could not have become a holder in due course because it had "close connections" with Delta. This contention need not detain us long. Under the so-called "close-connectedness" doctrine, which has not been recognized in New York, some states have endorsed the view that a transferee who has an " 'unusually close relationship with the transferor' " may not take an instrument from transferor as a holder in due course. *Vitols v. Citizens Banking Co.,* 10 F.3d 1227, 1233 (6th Cir.1993) (quoting *Arcanum National Bank v. Hessler,* 69 Ohio St.2d 549, 549, 433 N.E.2d 204, 206 (1982)); *see also Leasing Service Corp. v. River City Construction, Inc.,* 743 F.2d 871, 875–77 (11th Cir.1984) (discussing cases). At least one state court, however, noting the intimate relationship between the concepts of "close connectedness" and notice as defined in the UCC, has rejected the doctrine as "only a substitute for a proper analysis" of a party's holder-in-due-course status under UCC § 3–302(1). *Cessna Finance Corp. v. Warmus,* 159 Mich.App. 706, 712, 407 N.W.2d 66, 69 (1987).

Further, even the courts that have adopted this doctrine have generally applied it only in cases involving consumer credit transactions

in which the seller and the financing entity are intertwined or have an ongoing relationship encompassing many transactions. *See, e.g., Unico v. Owen,* 50 N.J. 101, 111–15, 232 A.2d 405, 410–12 (1967); *see also Leasing Service Corp. v. River City Construction, Inc.,* 743 F.2d at 876 (concluding that doctrine has been applied "only where there is a consumer involved who has been given a 'raw deal' "). *But see St. James v. Diversified Commercial Finance Corp.,* 102 Nev. 23, 26, 714 P.2d 179, 181 (1986) (adopting doctrine "with respect to all transactions where the buyer can demonstrate a close connection between the seller and lender").

We need not consider in this case whether or to what extent the New York courts would apply the "close-connectedness" doctrine where a seller and a lender have such a close relationship, or whether the doctrine would be applied to commercial credit transactions, for in the present case defendants have not pointed to any evidence suggesting that AITF and Delta had a close relationship. To the contrary, they concede that AITF had purchased notes from Delta on only one other occasion and that the two companies had no common management. Hence, even if recognized under New York law, the doctrine would afford defendants no basis for relief.

## CONCLUSION

We have considered all of defendants' arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.