**SEJIN PRECISION INDUSTRY CO., LTD., Mtekvision Co., Ltd., Sungjin Textile Industry Co., Ltd., Samhwan Steel Co., Ltd., Techno Electronics Co., Ltd., and Il Shin Spinning Co., Ltd., Plaintiffs,**

v.

**CITIBANK, N.A., Citigroup, Inc., Citibank Overseas Investment Corp., Citicorp Holdings, Inc., and Citigroup Global Markets, Inc., Defendants.**

16 Civ. 6910 (JSR)

United States District Court, S.D. New York.

Signed June 26, 2016

546

Alan Lee Poliner, Peter Boris Melamed, Kim & Bae, P.C., Fort Lee, NJ, Bong June Kim, Kim & Bae, P.C., New York, NY, for Plaintiff.

Daniel Mumford Perry, Daniel Byron Kaplan, Jed Mastren Schwartz, Scott Alexander Edelman, Taryn Jean Gallup, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for Defendant.

## MEMORANDUM ORDER

JED S. RAKOFF, United States District Judge.

In a bottom-line order dated November 4, 2016, the Court granted defendants' motion to dismiss plaintiffs' complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). This Memorandum Order explains the reasons for that ruling and directs the entry of final judgment dismissing the case.

The Complaint alleges the following facts relevant to this motion. Plaintiffs—Sejin Precision Industry Co., Ltd. ("Sejin"); Mtekvision Co., Ltd. ("Mtek"); Sungjin Textile Industry Co., Ltd. ("Sungjin"); Samhwan Steel Co., Ltd. ("Samhwan"); Techno Electronics Co., Ltd. ("Techno"); and Il Shin Spinning Co., Ltd. ("Il Shin")—are six South Korean manufacturers who export their products. Compl. ¶¶ 10–15, 33–37, ECF No. 1. They receive payment for their goods in various currencies, including U.S. dollars (or "USD"), and exchange those currencies for

Korean won (or "KRW"). They therefore bear the risk arising from fluctuations in the USD–KRW exchange rate: if, after they have negotiated a specific payment in dollars but before they can exchange those dollars for won, the dollar depreciates relative to the won, they will suffer a loss. Compl. ¶ 44. In order to hedge against this risk, some Korean exporters have used "forward contracts," under which they agree to exchange a certain quantity of dollars for a certain quantity of won at a set date in the future. Compl. ¶ 45.

In 2005, non-party Citibank Korea, Inc. ("CKI"), a subsidiary of defendant Citigroup, Inc. ("Citigroup"), Compl. ¶ 21, introduced a new financial product called a "KIKO," whose name is an acronym for "knock-in, knock-out." Compl. ¶ 48. In a KIKO transaction, both counterparties— CKI and the purchaser—receive options to exchange currency. The purchaser receives an option to exchange a specified quantity of won for a specified quantity of dollars on a fixed date, provided that the dollar depreciates relative to the won to a certain extent. Compl. ¶¶ 114, 126. However, if the dollar depreciates even further to a specified point known as the "knock-out" price, the purchaser loses the ability to exercise its option. Compl. ¶ 115. If, on the other hand, the dollar appreciates against the won and reaches a value known as the "knock-in" price, CKI can then exercise its option to exchange the currencies. Compl. ¶ 116.

Two features of the KIKO entailed that CKI stood to benefit more from fluctuations in the exchange rate than the purchaser did. First, unlike the purchaser's options, there was no "knock-out" price applicable to the option held by CKI. Compl. ¶ 117. Second, the KIKO contracts allowed CKI, when exercising its option, to exchange twice as much currency as the purchaser could under its option. Compl. ¶ 146. In other words, CKI was protected against, and, indeed, stood to profit by all but moderate changes in the exchange rate.[1]

---

1. To demonstrate the function of KIKOs and some of the terms that plaintiffs allege they contain, consider the following hypothetical example. On January 1, when the exchange rate is 1 USD = 1000 KRW, an exporter ships goods for which it expects to receive a $1000 payment on February 1. The exporter then enters a KIKO deal with CKI so that it has the option on February 1 to exchange $1000 for 1 million KRW (i.e., to make the exchange at the rate current on January 1), provided that the exchange rate on February 1 is 1 USD ≤ 900 KRW. However, the KIKO provides that there is a knock-out price, so that the exporter can no longer exercise the option if the exchange rate reaches 1 USD ≤ 800 KRW. Conversely, as part of the KIKO deal, CKI also receives an option to exchange 2 million KRW for $2000 on February 1, provided that the exchange rate reaches the knock-in price of 1 USD ≥ 1100 KRW.

If, on February 1, the dollar has depreciated such that the exchange rate is 1 USD = 900 KRW, then the exporter will exercise its option so that it can receive 1 million KRW for its $1000 (rather than the 900,000 KRW that it would receive if it made the exchange at the then-current rates). But if the dollar has depreciated even further such that the exchange rate is 1 USD = 700 KRW, i.e., below the knock-out price, then the exporter is unable to exercise its option and it suffers the loss from the dollar's depreciation: thus, the $1000 that it receives on February 1 is only worth 700,000 KRW.

On the other hand, if, on February 1, the dollar has appreciated such that the exchange rate is 1 USD = 1100 KRW, then CKI will exercise its option to receive $2000 for 2 million KRW (rather than the 2.2 million KRW that it would cost to receive $2000 at the then-current rates). Though the $1000 payment that the exporter receives on February 1 for the goods it shipped is worth 100,000 KRW more than the payment would have been worth under the rates on January 1, the exporter loses 200,000 KRW from the exercise of CKI's option and therefore suffers a net loss of 100,000 KRW.

Plaintiffs allege that Citigroup—in coordination with its co-defendants and subsidiaries Citibank, N.A. ("Citibank"); Citibank Overseas Investment Corporation; Citicorp Holdings, Inc.; and Citigroup Global Markets, Inc.—designed the KIKO and directed the marketing of KIKOs to unsophisticated small- and medium-sized businesses in emerging markets in Asia and Latin America through subsidiaries such as CKI. Compl. ¶¶ 52–55. Between November 2004 and March 2008, CKI entered into multiple KIKO contracts with each plaintiff. See Compl. ¶¶ 633, 669, 704, 726, 786–87, 844, 862, 875, 916, 944, 960. In 2007, the dollar was worth between 900 and 950 KRW. Compl. ¶ 265. Then, in March 2008, the dollar began appreciating considerably, equaling 1000 KRW by May 2008 and more than 1400 KRW in October 2008. Compl. ¶¶ 269, 274. Plaintiffs therefore suffered losses when CKI exercised its options to exchange won for more valuable dollars. Plaintiffs' alleged losses total $40, 450, 000. See Compl. ¶¶ 687, 751, 818, 869, 924, 973.

The thrust of plaintiffs' claims is that CKI, acting at the direction of defendants, led plaintiffs to believe that the KIKOs were risk-free ways to hedge against fluctuations in the exchange rate, whereas in fact they subjected plaintiffs to substantial losses that accrued to CKI's benefit. Specifically, plaintiffs allege that CKI made several misrepresentations, including that the KIKOs would serve as a hedge, Compl. ¶¶ 280–85, that the dollar would continue to appreciate relative to the won, Compl. ¶ 90, and that the KIKO transactions were "zero-cost," Compl. ¶¶ 311–19. Plaintiffs also assert that CKI failed to disclose material information, including that CKI's interests were contrary to plaintiffs' interests, Compl. ¶ 345, that Citibank was taking a position with regard to the USD–KRW exchange rate that was contrary to plaintiffs' position, Compl.

¶ 347, that CKI calculated the exchange rate, Compl. ¶ 353, and the magnitude of the potential losses that plaintiffs might face given extreme changes in the exchange rate, Compl. ¶ 354.

Plaintiffs also allege that CKI misled them in various other ways. According to plaintiffs, after negotiating the essential terms of a given KIKO deal, CKI sent them a document entitled "FX Options," which described the details of the deal in Korean and which they believed was the operative contract for the KIKO deal. Compl. ¶¶ 106–110. However, plaintiffs allege that CKI then sent them a document in English entitled "FX Confirmation" that contained new terms, including previously unmentioned premiums and a disclaimer of any fiduciary relationship. Compl. ¶¶ 111–12; see, e.g., Compl. ¶¶ 986–87. Plaintiffs allege that they could not understand this agreement because it was in English but that CKI nonetheless treated it as the operative agreement. Compl. ¶ 222. Plaintiffs also allege that CKI, after it executed KIKO transactions with plaintiff, entered into "reverse" or "mirror image" transactions with Citibank (the "reverse transactions"), whereby CKI would transfer to Citibank its potential gains and liabilities from the KIKO transactions with plaintiffs, thus putting Citibank in an adverse position with regard to plaintiffs, but that CKI did not alert plaintiffs to the existence of these transactions. Compl. ¶ 173. Finally, plaintiffs allege that between 2004 and 2012, defendants manipulated the WM/Reuters Closing Spot Rates (the "WM/R Rates"), which are widely used benchmark rates for the exchange of currency, and that such manipulation affected the value of the won relative to the dollar. Compl. ¶¶ 595, 600, 605.

Plaintiffs initiated this action on September 2, 2016. See Compl. Their 267–page, 2320–paragraph Complaint contains 102

counts, but they reduce to the same 17 claims asserted on behalf of each of the six plaintiffs. They include fraud in the execution, fraud in the inducement, negligence, breach of fiduciary duty, unjust enrichment, and recission.[2] The parties agree that New York law applies to all of plaintiffs" claims.

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In making this determination, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the claiming party. See Duffey v. Twentieth Century Fox Film Corp., 14 F.Supp.3d 120, 126 (S.D.N.Y. 2014). The Court need not credit, however, "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. "[L]egal conclusions masquerading as factual conclusions will not suffice." Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006).

As a threshold matter, defendants contend that all of plaintiffs' claims are time-barred. At the motion-to-dismiss stage, "dismissal is appropriate only if a complaint clearly shows the claim is out of time." Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999). The parties here agree that New York's law regarding limitations periods applies. Under New York law, "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued." N.Y. C.P.L.R. § 202. In other words, a claim that accrued outside New York must be brought within both New York's limitations period and the limitations period of the other jurisdiction. Plaintiffs, which are incorporated in and have their principal places of business in South Korea, see Compl. ¶¶ 10–15, do not dispute that their causes of action accrued in South Korea. See Glob. Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529, 715 N.E.2d 482, 693 N.Y.S.2d 479 (1999) (noting that New York courts have "consistently employed the traditional definition of accrual—a cause of action accrues at the time and in the place of the injury—in tort cases involving the interpretation of CPLR 202" and that "[w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss"). Thus, to be timely, plaintiffs' claims must have been brought within the statutes of limitations of both New York and South Korea. Because the claims were not brought within the relevant limitations pe-

---

**2.** Specifically, the claims are for fraud in the execution (Counts 1, 18, 35, 52, 69, 86); fraud in the inducement, conspiracy to commit fraud in the inducement, and aiding and abetting fraud based on misrepresentations and omissions regarding the KIKO products and risks attendant to them (Counts 2–4, 19–21, 36–38, 53–55, 70–72, 87–89); fraud, conspiracy to commit fraud, and aiding and abetting fraud regarding the reverse transactions (Counts 11–13, 28–30, 45–47, 62–64, 79–81, 96–98); fraud, conspiracy to commit fraud, and aiding and abetting fraud regarding manipulation of exchange rates (Counts 14–17, 31–34, 48–51, 65–68, 82–85, 99–102); negligence (Counts 5, 22, 39, 56, 73, 90); breach of fiduciary duty, conspiracy to breach fiduciary duty, and aiding and abetting breach of fiduciary duty (Counts 6–8, 23–25, 40–42, 57–59, 74–76, 91–93); unjust enrichment/restitution (Counts 9, 26, 43, 60, 77, 94); and recission/disgorgement (Counts 10, 27, 44, 61, 78, 95).

riods under New York law, they are untimely.

■ In New York, the limitations period for a fraud claim is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). "A tort claim accrues as soon as 'the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint.' " IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 140, 907 N.E.2d 268, 879 N.Y.S.2d 355 (2009) (quoting Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94, 612 N.E.2d 289, 595 N.Y.S.2d 931 (1993)).

■ For plaintiffs' fraud claims to be within the six-year period set forth in N.Y. C.P.L.R. § 213(8), they must have accrued no earlier than September 2, 2010. As noted above, plaintiffs entered into KIKO contracts with CKI between November 2004 and March 2008, and, given the dollar's appreciation relative to the won beginning in March 2008, they thereafter suffered losses from those contracts. Plaintiffs contend that it is not clear from the Complaint that their fraud claims accrued before the relevant period because it is not clear that they had suffered damages at that time. Specifically, they argue that the Complaint leaves open when plaintiffs suffered damages, since it "does not describe when the Plaintiffs' *damages* occurred, [but] only when *the facts leading up to their damages* occurred." Pl. Opp. at 8 (emphasis in original). Yet the Complaint alleges facts showing that each plaintiff suffered losses from the KIKOs by August 2010 at the latest, more than six years before plaintiffs initiated this action. See Compl. ¶ 655 (alleging that Sejin experienced losses between December 2007 and February 2008); Compl. ¶ 750 (alleging that CKI made its last trade under a KIKO contract with Mtek on January 21, 2010); Compl. ¶¶ 786–87, 794, 801, 804 (alleging that, in August 2007, Sungjin entered into three KIKO contracts that had at most three-year terms, and thus CKI's exercise of its options under those contracts must have taken place before or during August 2010); Compl. ¶ 867 (alleging that Samhwan suffered KIKO-related losses in 2009); Compl. ¶¶ 917–20 (alleging that Techno experienced losses between March and June 2008); Compl. ¶ 970 (alleging that II Shin experienced losses in March, September, and October of 2008). Thus, plaintiffs' fraud claims accrued outside of the six-year limitations period.

■ In the alternative, under the "discovery rule," the fraud claims may be timely if they were brought within two years of the date plaintiffs "discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). "The test as to when fraud should with reasonable diligence have been discovered is an objective one." Gutkin v. Siegal, 85 A.D.3d 687, 926 N.Y.S.2d 485, 486 (1st Dep't 2011) (quoting Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983)). "Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." Id. (quoting Armstrong, 699 F.2d at 88). Accordingly, "public reports and lawsuits of alleged fraud are sufficient to put a plaintiff on inquiry notice of fraud," and, "[s]imilarly, losses that a plaintiff sustains may put it on notice of possible fraud." Aozora Bank, Ltd. v. Deutsche Bank Secs. Inc., 137 A.D.3d 685, 29 N.Y.S.3d 10, 14 (1st Dep't 2016).

Plaintiffs assert that they discovered the fraud only in March 2016, as the result of an investigation by a plaintiff in a related case. Compl. ¶ 589. But plaintiffs had ample opportunity to discover the basis for their fraud claims far earlier. As noted above, plaintiffs suffered losses no later than 2010, and such losses would have "put [them] on notice of possible fraud." Aozora Bank, 29 N.Y.S.3d at 14. This is especially the case because their fraud claims are based in part on alleged misrepresentations that the KIKO transactions would not subject plaintiffs to the risk of losses from currency fluctuations, see, e.g., Compl. ¶ 1002, and therefore any such losses would have aroused suspicion that CKI's assurances in that regard were false. In addition, other cases were filed that contained allegations quite similar to the ones that plaintiffs put forth here. In July 2013, Simmtech Co. ("Simmtech"), a South Korean corporation, sued each of the defendants here. See Notice of Removal Ex. A, Simmtech Co. v. Citibank et al., 13–cv–6768 (KBF) (S.D.N.Y. Sept. 25, 2013), ECF No. 1. Like plaintiffs here, Simmtech alleged that CKI, at defendants' behest, fraudulently induced it to enter into KIKO contracts by misrepresenting that the KIKOs were "zero-cost" hedges against the risk of currency fluctuation and failing to disclose the existence of reverse transactions with Citibank Id. ¶¶ 3–8. Then, in November 2013, Simmtech filed a putative class action alleging that Citigroup, Citibank, and CKI, among other financial institutions, conspired to manipulate the WM/R Rates, which affected currency exchange trades around the world. See Class Action Compl. for Violations of the Sherman Act and N.Y. G.B.L. §§ 340 & 349 at ¶¶ 5–6, Simmtech Co. v. Barclays Bank PLC et al., 13–cv–7953 (LGS)

(S.D.N.Y. Nov. 8, 2013), ECF No. I.[3] Plaintiffs reject the view that these filings sufficed to put them on notice of their claims, but they do not point to any allegations in the Complaint that demonstrate their exercise of diligence in investigating those claims. Taken together, the incurring of significant losses, which clearly demonstrated the falsity of defendants' alleged misrepresentations, and the existence of the aforementioned lawsuits, which set out in some detail facts relevant to each of the claims that plaintiffs bring, provide a sufficient basis for the Court to conclude that plaintiffs could have discovered the alleged fraud with reasonable diligence.

Plaintiffs resist this conclusion, arguing that no amount of diligence could have uncovered the alleged fraud. See Compl. ¶ 586 ("None of the facts or information available to Plaintiffs, if investigated with reasonable diligence, could or would have led to the discovery of the conduct alleged in this Complaint."). This is because, they assert, defendants concealed their wrongdoing, and therefore the statute of limitations is tolled by the doctrines of fraudulent concealment, equitable estoppel, and equitable tolling.

"[T]he purpose of the fraudulent-concealment doctrine is to prevent a defendant from concealing a fraud, or committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988) (alterations and quotation omitted). That doctrine "operates to toll the statute if the plaintiff alleges: (1) that the defendants concealed the cause of action; (2) that the plaintiff did not discover the cause of action until some point within five years of commencing the ac-

---

**3.** The Court takes judicial notice of these filings. See Kavowras v. N.Y. Times Co., 328 F.3d 50, 57 (2d Cir. 2003) ("Judicial notice may be taken of public filings.").

tion; and (3) that the plaintiff's continuing ignorance was not attributable to lack of diligence on its part." SEC v. Power, 525 F.Supp.2d 415, 424 (S.D.N.Y. 2007). A "plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." Hendrickson Bros., 840 F.2d at 1083. Allegations of concealment, unless they consist of alleging a self-concealing wrong, must ordinarily satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b). In re Nat. Gas Commodity Litig., 337 F.Supp.2d 498, 513–14 (S.D.N.Y. 2004).

■ Plaintiffs here do not allege, except in a conclusory fashion, that defendants took affirmative steps to conceal the alleged fraud or the resulting injury from plaintiffs. See Compl. ¶¶ 583–592. They rely instead on the argument that defendants' fraud was self-concealing, by virtue of the fact that Citigroup's corporate structure obscured defendants' role in the transactions with plaintiffs and that the reverse transactions were unknown to plaintiffs. Yet plaintiffs cite no authority in support of their assertion that the alleged fraud here amounts to a self-concealing wrong.[4] Courts in this district have held that, "standing alone, allegations of fraud are generally insufficient to demonstrate that a particular act is self-concealing." SEC v. Jones, 476 F.Supp.2d 374, 382 (S.D.N.Y. 2007). Rather, "for a fraud to be self-concealing, the defendant must have engaged in some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that was designed to mask the cause of action." Id. (internal quotation marks and alterations omitted). Despite plaintiffs' general allegation that defendants "engaged in secret and surreptitious activities" in order to conceal their misconduct, Compl. ¶ 583–84, neither the relationships between the defendants and CKI nor the existence of the reverse transactions reflect a "contrived action or scheme" "designed to mask the cause of action." Id. Thus, plaintiffs have not established that the alleged fraud was self-concealing.

Furthermore, even if the alleged fraud had been concealed, Simmtech's filing of the two actions in 2013 ensured that the operative facts giving rise to plaintiffs' claims were in the public domain well before the limitations period for fraud claims arising out of the KIKO transactions would have run. Cf. Hendrickson Bros., 840 F.2d at 1085 (concluding that the conspiracies alleged in the complaint were self-concealing while also approving of the trial court's instruction to the jury that the plaintiff could not meet its burden to show its due diligence if it had a suspicion of collusion or "any other information that should have alerted it to its claim of an overall conspiracy"). Thus, plaintiffs' contention that defendants' fraudulent concealment of their wrongdoing made it impossible for plaintiffs to discover the alleged fraud despite exercising reasonable diligence rings hollow, and their argument for the application of the fraudulent concealment doctrine fails for that reason as well.

---

4. Plaintiffs' appeals to In re Nine West Shoes Antitrust Litigation, 80 F.Supp.2d 181, 193 (S.D.N.Y. 2000), and Power, 525 F.Supp.2d at 426, are misplaced. In Nine West, the plaintiff sufficiently alleged a price-fixing scheme, which the Second Circuit has held is a self-concealing offense. See Hendrickson Bros., 840 F.2d at 1084–85. And in Power, the plaintiff alleged affirmative acts by a defendant to conceal the fraudulent nature of a transaction. 525 F.Supp.2d at 426. Plaintiffs here have failed to plead either a recognized self-concealing offense or an affirmative acts.

Plaintiffs' argument that equitable estoppel applies fails for the same reasons that plaintiffs are unable to sufficiently plead fraudulent concealment. Under New York law, "[e]quitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the defendant." Putter v. N. Shore Univ. Hosp., 7 N.Y.3d 548, 552–53, 858 N.E.2d 1140, 825 N.Y.S.2d 435 (2006). This doctrine is based on the principle that a wrongdoer "cannot take affirmative steps to prevent a plaintiff from bringing a claim and then assert the statute of limitations as a defense," and "[i]t is therefore fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit." Zumpano v. Quinn, 6 N.Y.3d 666, 674, 849 N.E.2d 926, 816 N.Y.S.2d 703 (2006). Thus, "equitable estoppel does not apply where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying cause of action." Abercrombie v. Andrew Coll., 438 F.Supp.2d 243, 265 (S.D.N.Y. 2006) (quoting Kaufman v. Cohen, 307 A.D.2d 113, 760 N.Y.S.2d 157, 167 (1st Dep't 2003)).

Where, as here, "the claims are prima facie barred by the statute of limitations, the plaintiff must make sufficient factual allegations that each of the requirements of equitable estoppel is satisfied." Twersky v. Yeshiva Univ., 993 F.Supp.2d 429, 442 (S.D.N.Y. 2014), aff'd, 579 Fed.Appx. 7 (2d Cir. 2014). Plaintiffs have failed to do so here, for the reasons explained above with regard to the application of the fraudulent concealment doctrine: plaintiffs have not alleged any specific actions taken by defendants subsequent to the alleged fraud that prevented plaintiffs from timely bringing suit on their claims.[5]

Finally, plaintiffs also contend that equitable tolling should render timely their claims. That doctrine permits a plaintiff to avoid the effect of a statute of limitations "if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim," even in the absence of fraudulent concealment by the defendant. Valdez ex rel. Donely v. United States, 518 F.3d 173, 182 (2d Cir. 2008) (quotation omitted). But "the doctrine of equitable tolling is not available in state causes of action in New York." Jang Ho Choi v. Beautri Realty Corp., 135 A.D.3d 451, 22 N.Y.S.3d 431, 432 (1st Dep't 2016). Thus, that doctrine cannot render timely plaintiffs' claims, all of which are for causes of action under New York law. In sum, plaintiffs' fraud claims were not brought within the applicable six-year period, and neither the discovery rule nor the doctrines of fraudulent concealment, equitable estoppel, and equitable tolling save those claims from being untimely.

Plaintiffs' claims for negligence, breach of fiduciary duty and unjust enrichment are untimely as well. Plaintiffs do not dispute that the applicable limitations period for each of those claims is at most six years. See Pl. Opp. at 9 (asserting that "the statute of limitations for negligence,

---

**5.** In addition, where a plaintiff seeking to apply equitable estoppel does not allege that a defendant made an actual misrepresentation, "the plaintiff must demonstrate a fiduciary relationship which gave the defendant an obligation to inform him or her of facts underlying the claim." Zumpano, 6 N.Y.3d at 675, 816 N.Y.S.2d 703, 849 N.E.2d 926 (internal quotation marks and alteration omitted). As explained infra, no fiduciary relationship existed between plaintiffs and defendants here.

breach of fiduciary duty, unjust enrichment, and fraud is six years" (footnotes omitted)); see also IDT Corp., 12 N.Y.3d at 139, 879 N.Y.S.2d 355, 907 N.E.2d 268 (noting that the limitations period for a breach of fiduciary duty claim is generally three years, but, if the claim seeks equitable relief or if an allegation of fraud is essential to the claim, the period is six years); Matana v. Merkin, 957 F.Supp.2d 473, 494 (S.D.N.Y. 2013) (noting that the limitations period for unjust enrichment is "six years where plaintiff seeks an equitable remedy, but three years where plaintiff seeks monetary damages"); Fromer v. Yogel, 50 F.Supp.2d 227, 242 (S.D.N.Y. 1999) (noting that courts have applied both three-year and six-year limitations periods to negligent misrepresentations claims and concluding that a six-year period applies where the allegations underlying such claims also state causes of action for fraud). Each of those claims accrued no later than the fraud claims accrued. See IDT Corp., 12 N.Y.3d at 140, 879 N.Y.S.2d 355, 907 N.E.2d 268 ("A tort claim accrues as soon as 'the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint.'" (quoting Kronos, Inc., 81 N.Y.2d at 94, 595 N.Y.S.2d 931, 612 N.E.2d 289)); Matana, 957 F.Supp.2d at 494 (noting that that the period for unjust enrichment begins to run "upon the occurrence of the wrongful act giving rise to a duty of restitution" (internal quotation marks omitted)). Thus, plaintiffs' claims for negligence, breach of fiduciary duty, and unjust enrichment are untimely. Because, as explained infra, plaintiffs' claims for recission merely seek remedies for those untimely asserted substantive claims, the recission claims are untimely as well.

In short, each and every one of plaintiffs' claims is time-barred.

In addition, and as an independent reason for the dismissal of the Complaint, plaintiffs have failed to state a claim for any of the causes of action they assert.

 The Court first considers plaintiffs' fraud claims. "Under New York law, 'to state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury.'" Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291 (2d Cir. 2006) (quoting Kaufman, 760 N.Y.S.2d at 165). In turn, "[t]o establish causation, [a] plaintiff must show both that [the] defendant's misrepresentation induced [the] plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which [the] plaintiff complains (loss causation)." Laub v. Faessel, 297 A.D.2d 28, 745 N.Y.S.2d 534, 536 (1st Dep't 2002). Under Federal Rule of Civil Procedure 9(b), when pleading a fraud claim, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted).

 Most of plaintiffs' fraud claims center on alleged statements by representatives of CKI that the dollar would depreciate relative to the won, that the KIKOs were a "hedge" against the risk of fluctuation in the exchange rate, and that they were a "zero cost" instrument.[6] The first

---

**6.** In their briefing, plaintiffs do not dispute defendants' assertion that the claims styled

"fraud in the execution" are nonetheless grounded in a fraudulent inducement theory.

type of statement is a prediction of future events, which courts applying New York law have held cannot sustain a fraud claim. See Hampshire Equity Partners II, L.P. v. Teradyne, Inc., No. 04 Civ. 3318 (LAP), 2005 WL 736217, at *4 n.4 (S.D.N.Y. Mar. 30, 2005) (noting that forecasts of future business prospects are not actionable); DH Cattle Holdings Co. v. Smith, 195 A.D.2d 202,607 N.Y.S.2d 227, 231 (1st Dep't 1994) (noting that an assurances that a venture is a "safe investment" are "generally considered, not actionable statements of fact, but mere opinion and puffery"). Plaintiffs provide no authority whatsoever to the contrary. They do argue that, at the time of the alleged misstatements, defendants did not believe that the dollar would appreciate, and that this subjective disbelief renders the statements actionable. But, even if such statements could be actionable,[7] plaintiffs have pleaded defendants' alleged subjective disbelief in only conclusory terms. See, e.g., Compl. ¶ 668 ("At the time CKI made this representation [that the dollar would not appreciate], Defendants believed internally that there was a strong likelihood that the Dollar would strengthen ..."). Thus, to the extent that one can infer from the facts alleged that defendants did not believe that the value of the dollar relative to the won would move in only one direction—which would be reasonable, given the difficulty of predicting market movements with any certainty—plaintiffs could have made the very same inference.

■ That conclusion points to an additional defect in plaintiffs' fraud claims based on predictions of the dollar's value:

plaintiffs' reliance on these alleged misrepresentations was clearly unreasonable. Given that plaintiffs chose to enter into contracts to hedge against the risk of fluctuation in the USD–KRW exchange rate, it is clear that they were aware that the rate could change significantly. Moreover, by the very structure of the KIKO, it was apparent that CKI was taking the other side of each KIKO transaction, i.e., betting that the dollar would appreciate relative to the won. It therefore would be unreasonable for plaintiffs to rely on a representation by CKI that implied CKI continued to make bets that it was sure it would lose. Thus, plaintiffs' fraud claims based on alleged misrepresentations about the future value of the dollar relative to the won must fail.

Plaintiffs' fraud claims based on the alleged statements that the KIKOs were "hedges" against risk fail for similar reasons. Since the KIKO did in fact serve as a hedge against the depreciation of the dollar relative to the won, at least when the dollar was within a certain range of values, the description of the KIKO as a hedge is only false to the extent that one takes the position that a hedge eliminates all risk, as plaintiffs appear to assert. However, as noted above, it would be unreasonable for plaintiffs to rely on a representation that the KIKO eliminated all risk of loss, especially because the basic structure of the KIKO entailed that plaintiffs would suffer losses if the dollar strengthened to a certain extent.

Plaintiffs' fraud claims based on statements that the KIKOs were "zero-cost" also fail. The Complaint alleges that

See Def. Mem. 7; Pl. Opp. 17–27 (advancing only a fraudulent inducement theory).

7. Here, too, plaintiffs have failed to provide apposite authority, as they identify no cases that, applying New York law, hold that subjective disbelief in an otherwise non-action-

able statement allows a fraud claim based on that statement. Rather, they cite only federal cases dealing with alleged violations of the federal securities laws and associated regulations. See Pl. Opp. 21 n.37.

"[e]ach KIKO contained a nominal premium that was paid by the option holder to the party against whom the option could be exercised," but that "the premiums that Plaintiffs were required to pay CKI exceeded those that CKI was required to pay Plaintiffs," thus rendering false alleged statements that the net cost of these premiums would be zero. Compl. ¶¶ 311, 313, 314. Yet plaintiffs do not plead any facts supporting the assertion that they were obligated to pay more in premiums to CKI than CKI was obligated to pay to them, and they therefore do not demonstrate that any differential in the amount of the premiums caused them injury.[8]

Nor do plaintiffs state claims for fraud based on omissions. Two alleged omissions—that CKI's interests were contrary to Plaintiffs' interests, see Compl. ¶ 345, and that plaintiffs might suffer significant losses in the event of extreme changes in the exchange rate, see Compl. ¶ 354—were readily apparent from the basic terms of the KIKO transactions, of which plaintiffs do not contend they were ignorant. Plaintiffs have not sufficiently pleaded that the two other alleged omissions that they assert—that Citibank was taking a position with regard to the USD–KRW exchange rate that was contrary to Plaintiffs' position, see Compl. ¶ 347, and that CKI calculated the exchange rate, see Compl. ¶ 353—were material. Given that CKI was taking a position contrary to plaintiffs' position, whether Citibank did so as well does not provide any more reason to doubt the wisdom of entering the arrangement with CKI. Plaintiffs have not identified any allegation in the Complaint that shows that the calculation of the exchange rate by CKI, rather than by a third party, led to plaintiffs' losses.

Plaintiffs' fraud claims based on the alleged reverse transactions between CKI and Citibank also fail. Whether CKI retained any proceeds it received from the KIKO transactions with plaintiffs or whether CKI instead conveyed any such proceeds to Citibank is immaterial to whether plaintiffs suffered losses from those transactions. Thus, plaintiffs' conclusory allegation that they would not have entered the KIKO transactions had they known of the reverse transactions is implausible. In addition, even if the omission of information regarding the reverse transactions caused plaintiffs to enter the KIKO transactions, plaintiffs have only pleaded that the omission was the but-for cause of their losses, whereas a plaintiff must also plead loss causation, i.e., "that the defendant's misrepresentation 'directly and proximately caused his ... losses.'" Amusement Industries v. Stern, 693 F.Supp.2d 327, 352 (S.D.N.Y. 2010) (quoting Laub, 745 N.Y.S.2d at 537). Plaintiffs' assertion that courts have abandoned the requirement of loss causation except in the context of fraud claims relating to securities is mistaken. See id. Thus, their inability to plead that the reverse transactions caused their losses, rather than merely transferred their losses to a different entity, entails that plaintiffs have not stated a fraud claim in this regard.

8. In addition, plaintiffs assert in their Complaint that CKI representatives falsely described the KIKOs as "government-supported" to two of the plaintiffs, Sejin and Mtek. Plaintiffs do not defend this basis for their fraud claims in their briefing. In any case, this alleged misstatement does not support a fraud claim. As presented in the Complaint, those statements amount to additional assurances that the KIKOs did not subject plaintiffs to the risk of losses. See, e.g., Compl. ¶ 624 ("Mr. Choi told Mr. Yu that, because this was a government-supported product, CKI would neither lose money nor make money from the product."). As explained above, plaintiffs' reliance on representations that they would not lose money from the KIKOs was unreasonable.

Finally, plaintiffs' fraud claims based on alleged manipulation of currency exchange rates fail for lack of adequately pleading loss causation as well. Plaintiffs plead in only the most conclusory fashion that the alleged manipulation affected the USD–KRW exchange rate, see Compl. ¶ 600 ("Upon information and belief, these attempts to manipulate WM/R Rates succeeded and affected the Korean Won"), and they provide no factual support for the claim that the manipulation caused their losses, see, e.g., Compl. ¶ 1170 (alleging, without any explanation, that defendants "reap[ed] a benefit created by the differential between the manipulated exchange rate and the unmanipulated exchange rate."). In fact, plaintiffs effectively concede that they have not shown that the alleged manipulation had any impact on the KIKO transactions. See Pl. Opp. 25 ("Plaintiffs need not allege that the foreign exchange rate market manipulation directly affected the KIKOs. Plaintiffs needed to, and did, allege that the omission and concealment of the foreign exchange rate market manipulation was material to the inducement for them to enter into KI-KOs."). Plaintiffs therefore have not sufficiently pleaded that any manipulation directly caused their losses.

In sum, each of the causes of action based in fraud fails to state a claim. Accordingly, the causes of action for aiding and abetting fraud and conspiracy to commit fraud fail as well, as they rely on the same allegations that are insufficient to support plaintiffs" fraud claims. See Eaves v. Designs for Fin., Inc., 785 F.Supp.2d 229, 257 (S.D.N.Y. 2011) ("[T]o establish a claim for civil conspiracy, a plaintiff must first demonstrate an underlying tort upon which the conspiracy may be based."); Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000) (noting that "a claim for aiding and abetting fraud requires plaintiff to plead facts showing the existence of a

fraud," among other elements (internal quotation marks omitted)).

■ Turning next to plaintiffs' negligence claims, plaintiffs advance a theory of negligent misrepresentation, arguing that a special relationship gave rise to a duty on defendants' part to impart correct information. See Pl. Opp. 27–28. "To prevail on a claim of negligent misrepresentation under New York law, a plaintiff must show '(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 490 (2d Cir. 2014) (quoting J.A.O. Acquisition Corp. v. Stavitsky, 8 N.Y.3d 144, 148, 863 N.E.2d 585, 831 N.Y.S.2d 364 (2007)). For the reasons discussed above with regard to plaintiffs' fraud claims, plaintiffs have not sufficiently alleged the existence of actionable misrepresentations or omissions on which they reasonably relied, and therefore they cannot sustain their negligent misrepresentation claims.

■ The Court next considers plaintiffs' breach of fiduciary duty claims, in which they claim that defendants, "by and through CKI, established a fiduciary duty to [plaintiffs] by the provision of expert financial advice," and thereafter breached that duty by providing false or inadequate advice. Compl. ¶¶ 1091–93, 1319–21, 1544–45, 1765–67, 1990–92, 2212–15. Defendants contend that these claims must fail because no fiduciary relationship existed between plaintiffs and either CKI or defendants. "A fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Roni LLC v. Arfa, 18 N.Y.3d 846, 848, 963

N.E.2d 123, 939 N.Y.S.2d 746 (2011) (internal quotation marks omitted). "When parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." In re Mid–Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir. 2002) (internal quotation marks omitted).

▆▆ Plaintiffs argue that they have pleaded the existence of a fiduciary relationship by alleging that CKI provided plaintiffs with advice on certain matters, including the future movements of the USD–KRW exchange rate and the operation of the KIKO agreements, that were particularly within CKI's and defendants' knowledge. See Compl. ¶¶ 361–64. Yet the alleged provision of such advice (much of which, as discussed above, was not to be reasonably relied on) cannot demonstrate "a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions" given the obvious adverseness of CKI and plaintiffs in the KIKO transactions. EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19, 832 N.E.2d 26, 799 N.Y.S.2d 170 (2005). The basic structure of the transactions entailed that CKI's gains came at plaintiffs' expense. Accordingly, CKI and plaintiffs did not, through their dealings, establish a relationship whereby CKI was to "act for or to give advice for the benefit of" plaintiffs. Roni LLC, 18 N.Y.3d at 848, 939 N.Y.S.2d 746, 963 N.E.2d 123.

EBC I, which plaintiffs cite in support of their contention that CKI and plaintiffs established a relationship of higher trust outside of their contractual relationship, does not suggest a contrary result. In that case, the plaintiff enlisted the defendant to advise it in advance of, as well as to underwrite, an initial public offering, and, given the terms of the offering, the plaintiff had

reason to believe that its interests were aligned with those of the defendant. EBC I, 5 N.Y.3d at 20–21, 799 N.Y.S.2d 170. Here, in contrast, the zero–sum nature of the transactions indicates that CKI's and plaintiffs' interests were not aligned, and they were therefore dealing at arms' length, which defeats the existence of a fiduciary relationship and, in turn, plaintiffs' claims for breach of fiduciary duty. Given the failure of those claims, plaintiffs' claims for conspiracy to breach fiduciary duties and aiding and abetting the breach of fiduciary duties fail as well. See Eaves, 785 F.Supp.2d at 257; In re Sharp Int'l Corp., 403 F.3d 43, 49 (2d Cir. 2005) (noting that one element of a claim for aiding and abetting a breach of fiduciary duty is a fiduciary's breach of obligations to another).

▆▆ Turning next to plaintiffs' unjust enrichment claims, "[t]he basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). In support of their claims, plaintiffs put forth the threadbare allegations that Citibank was enriched by the reverse transactions and that this enrichment came at plaintiffs' expense. See, e.g., Compl. ¶¶ 1116–17. Because the reverse transactions between CKI and Citibank, on their own, in no way came at plaintiffs' expense, plaintiffs' theory in this regard appears to be that CKI wrongfully obtained funds from plaintiffs (by virtue of the various allegedly fraudulent representations and omissions that are the basis for plaintiffs' fraudulent inducement claims), that Citibank then obtained those funds, and that it would be unjust for Citibank to retain those funds.

Yet, as the discussion above establishes, plaintiffs have failed to sufficiently plead that their losses on the KIKO transactions were the result of wrongdoing by CKI or defendants. Thus, because the unjust enrichment claims are based on the same allegations that underlie the fraud claims, to the extent the fraud claims "are defective, an unjust enrichment claim cannot remedy the defects" and should be dismissed. Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 791, 967 N.E.2d 1177, 944 N.Y.S.2d 732 (2012).

▇ Lastly, the Court addresses plaintiffs' claims for recission. Since "rescission is simply an equitable remedy that might be available if a claim for legal liability were established," it must fail where, as here, plaintiffs have failed to sufficiently plead any other causes of action. Girl Friends Prods., Inc. v. ABC, Inc., No. 99 Civ. 1541 (JSR), 2000 WL 1505978, at *5 n.3 (S.D.N.Y. Oct. 10, 2000). Moreover, even assuming plaintiffs were correct that one may assert an independent cause of action for recission based on fraudulent inducement, unilateral mistake, or unconscionability, see Pl. Opp. 32, plaintiffs have failed to sufficiently plead fraudulent inducement for the reasons discussed above, and the Complaint does not identify any unilateral mistake nor any grounds for concluding the KIKO contracts are unconscionable. Accordingly, plaintiffs have failed to plead recission.

In sum, each of plaintiffs' claims is time-barred and fails to state a claim for which relief can be granted. For those reasons, the Court dismissed plaintiffs' Complaint in its entirety, with prejudice.[9] The Clerk of the Court is directed to enter final judgment dismissing the Complaint and to close the case.

SO ORDERED.

---

9. Given that the Court has identified ample reasons to dismiss plaintiffs' claims, it does not reach the additional grounds for dismissal put forth by defendants.